LANSFORD–COALDALE JOINT WATER
AUTHORITY, Appellant in
No. 92–7605

v.

TONOLLI CORPORATION; Tonolli
Canada, Ltd.; IFIM International
B.V., Appellants in No. 92–7671.

Nos. 92–7605, 92–7671.

United States Court of Appeals,
Third Circuit.

Argued June 24, 1993.

Decided Sept. 17, 1993.

John M. Hyson (argued), Villanova, PA, Anthony J. Mazullo, Jr., Doylestown, PA, for appellant in No. 92–7605.

Bernard A. Labuskes, Jr. (argued), Terry R. Bossert, Scott A. Gould, McNees, Wallace & Nurick, Harrisburg, PA, for appellants in No. 92–7671.

Before: BECKER, ALITO and ROTH, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

The plaintiff, the Lansford–Coaldale Joint Water Authority ("Authority"), provides public water in Carbon County, Pennsylvania. The Authority's groundwater production and supply wells are adjacent to a site formerly used for lead smelting that is owned by Tonolli Pennsylvania ("Tonolli PA"). After learning that there had been releases of hazardous substances on the Tonolli site and that Tonolli PA had applied for a hazardous waste disposal permit, the Authority commissioned a study to determine whether there was or would be any contamination of its wells. Based on this study, the Authority brought suit against Tonolli PA, its sister corporation, Tonolli Canada, and its parent corporation, IFIM, alleging that they were owners or operators of the Tonolli PA facility and that hazardous discharges from their property posed a threat of future contamination to the Authority's water supply. Because Tonolli PA had become bankrupt, the Authority subsequently dropped its claims against it, and the trial proceeded against only Tonolli Canada and IFIM. The Authority's suit sought to recover response costs under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607(a). More specifically, the Authority sought to obtain both the costs it would incur due to the threat of future contamination, e.g., the costs of obtaining an alternative water supply, and the costs it would incur in monitoring and evaluation. At the conclusion of the trial, the district court made oral findings of fact and conclusions of law denying the Authority recovery on all claims. This appeal followed.

At the heart of the Authority's appeal is an attack on the district court's fact findings. First, the Authority asserts that the findings are tainted because they were made orally only a few hours after a long and complex trial and were principally drawn verbatim from Tonolli Canada's proposed findings. Second, the Authority contends that the district court's finding that the hazardous waste releases at the Tonolli site posed no threat to the Authority's water supply, which was based upon a finding of hydrogeologic separation of the Tonolli site from the Authority site, was clearly erroneous. Third, the Authority contends that, even if that finding is upheld, we should reverse the district court's failure to authorize recovery of monitoring and evaluation costs against Tonolli Canada because it was the owner or operator of the Tonolli PA facility.

We acknowledge that the district court might have made more precise findings had it taken the time to await the trial transcript and to draft a written opinion. Moreover, the findings might have been better had they not drawn so heavily on Tonolli Canada's proposed findings. But the court's oral findings offered the distinct advantage of fresh recollection and prompt justice. We therefore reject the Authority's suggestion that the court's findings are deficient because of the nature of their construction and delivery and hold that they did not violate the requirements of Fed.R.Civ.P. 52(a). Pursuant to that rule, we review them only for clear error.

On the most important issue to the parties, the threat posed to the Authority's water supply, the district court was faced with a "battle of the experts." It found Tonolli Canada's expert more credible than the Authority's expert and we are satisfied that the court's findings on this claim are not clearly erroneous.

However, we will vacate the district court's judgment on the monitoring and evaluation costs claim against Tonolli Canada. In reaching its conclusion that Tonolli Canada should not be deemed an operator, the district court applied the correct inquiry for determining whether Tonolli Canada was a CERCLA operator, i.e., whether it actively participated in the management of the affiliated corporation during a period of hazardous waste disposal. The federal courts are divided over this issue, but we hold that this

represents the correct standard. Nevertheless, due to the district court's failure to address several critical factual issues, we will vacate the judgment on this count and remand for more detailed fact findings.

Finally, the Authority contends that the district court improperly granted judgment in favor of the parent corporation, IFIM, which never filed an answer or otherwise appeared in this case. We will affirm the judgment in favor of IFIM on the Authority's claim for the costs of obtaining a new water supply and/or treating its current supply because such a result is dictated by the rule prohibiting inconsistent judgments. However, with respect to the judgment in favor of IFIM on the monitoring and evaluation costs claim, because the district court provided no explanation for its decision and we can discern no basis for it, we will vacate this portion of the judgment and remand to the district court for further consideration.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

Tonolli Canada is a Canadian Corporation engaged in the business of lead smelting and metal reclamation. In the early 1970's, Tonolli Canada decided to open a smelting facility in the northeastern United States to reduce transportation costs and improve customer service. It chose a site near Nesquehoning, Carbon County, Pennsylvania. Tonolli PA was incorporated to construct and operate the facility, and Tonolli Canada was its sole shareholder from its incorporation in 1972 until 1976. In 1976, IFIM, a Dutch corporation, purchased all of the Tonolli PA stock and also became the parent corporation of Tonolli Canada. The Nesquehoning plant commenced operations in 1975. The plant site is located approximately 3,100 feet from the Authority's production wells.

In the early 1980's, the Authority learned through a public announcement that Tonolli PA had applied for a permit to dispose of hazardous waste at the Nesquehoning site. The parties have also conceded that Tonolli PA was responsible for the release of hazardous substances there, although it is unclear

from the record as to when these releases occurred and when the Authority became aware of them. In any event, sometime after learning about the releases as well as Tonolli PA's permit application, the Authority commissioned a study to determine whether there was or would be any contamination in its wells from the Tonolli site. That study, conducted in July, 1987 and known as the AGES study,[1] forms the Authority's proof regarding a threat of contamination from the Tonolli site.

Although the Authority's wells are concededly upgradient from the Tonolli site, the Authority claims the study shows that continuous pumping of groundwater for a 72–hour period resulted in a reversal in the direction of the groundwater which, if true, means that lead contaminants from the Tonolli site could infiltrate the Authority's water supply. Tonolli Canada denies that such conclusions can be drawn from the AGES study, and has offered its own expert testimony that the Tonolli discharge did not and cannot affect the Authority's wells.

The Authority brought suit against Tonolli PA, Tonolli Canada, and IFIM, originally alleging only common law claims, but then adding a claim for private cost recovery under CERCLA. The Authority subsequently dropped its claim against Tonolli PA, which had become bankrupt, so that the trial proceeded against only Tonolli Canada and IFIM. IFIM, however, has never answered or otherwise appeared in the case, although no motion for a default judgment has been made by the Authority. Without explanation, the district court entered judgment in IFIM's behalf at the close of the trial. The Tonolli Canada submissions advance a procedural argument on behalf of IFIM, but the Tonolli Canada lawyers do not represent IFIM.

The liability phase of the trial took nine days, spread out over December, 1991 and January and February, 1992. Within hours of the conclusion of the trial, the court delivered 150 oral findings, most of which it took verbatim from Tonolli Canada's proposed findings given to the court at the beginning of the trial.

1.  AGES is the acronym for Applied Geotechnical    and Environmental Service Corp.

With respect to the Authority's more substantial monetary claim—its allegation that releases at the Tonolli site have created a threat of contamination that will cause the Authority either continuously to treat its water supply or to secure a new one—the court found squarely for the defendants. Most importantly, the district court found that the Authority had not proved that there is any threat of future contamination to the Authority's water supply. However, with respect to the Authority's claim for monitoring and evaluation costs, the court found that a release at the Tonolli site had induced the Authority to incur monitoring and evaluation expenses (i.e., the costs of the AGES study). The court nonetheless denied recovery for these costs because it concluded that the Authority had not established the other necessary elements of their claim under CERCLA, specifically, Tonolli Canada's status as an owner or operator under CERCLA, the necessity of the Authority's expenses and their consistency with the National Contingency Plan ("NCP"). The district court therefore entered judgment on all counts for Tonolli Canada, and, as noted above, for IFIM. This appeal on the CERCLA issues followed. The disposition of the common law negligence counts has not been appealed.[2]

## II. SCOPE OF REVIEW

■ Both the Authority and Tonolli Canada agree that the issues that surround the district court's grant of judgment in favor of Tonolli Canada on both claims present mixed questions of law and fact. The general rule is that we break down the issues into their legal and factual components and engage in plenary review of the legal and factual components and engage in plenary review of the legal components and deferential review of the factual components. *See Ram Constr. Co. v. American States Ins. Co.*, 749 F.2d

1049, 1053 (3d Cir.1984). There is disagreement, however, over the appropriate scope of review of the district court's factual findings in this case. While ordinarily the factual components are reviewed only for clear error, the Authority contends that the district court's factual findings here do not satisfy the purposes of Fed.R.Civ.P. 52(a) and hence should not be reviewed under a clearly erroneous standard.

The Authority complains that, despite the complexity of the case, the district court made its findings within a few hours after the trial ended instead of waiting for a transcript and taking the time to reflect and craft a written opinion. It also objects to the court's having requested proposed findings from the parties only before and not after the trial. These objections seem to us designed more to undermine the substance of the findings themselves than to advance a claim of flawed methodology in their creation. However, the Authority also argues that the district court's findings are not entitled to deference on appeal because most of them were adopted verbatim from the defendant's proposed findings of fact.

■ We reject the Authority's contention that, because the district court issued its findings orally a few hours after the trial without the benefit of proposed findings submitted by the parties post-trial, the findings do not satisfy the purposes of Fed.R.Civ.P. 52(a). Rule 52(a) expressly authorizes oral findings.[3] In fact, in 1983 Rule 52(a) was amended explicitly to sanction the use of oral findings in bench trials. *See generally* 9 Charles A. Wright, Arthur R. Miller & Frank W. Elliot, *Federal Practice & Procedure* § 2571, at 225 (Supp.1993). Not only did the district court's approach not violate the literal language of Rule 52(a), but contrary to the Authority's argument, it did not violate the spirit of the rule.

**2.** The district court had jurisdiction under 42 U.S.C. § 9613(b). We have jurisdiction under 28 U.S.C. § 1291.

**3.** Rule 52(a) states in relevant part:
In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon.... Findings of fact, whether based on oral or documentary

evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses.... *It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence....*
Fed.R.Civ.P. 52(a) (emphasis added).

■ We do not deny the force of the Authority's contention that the district court would have been well-served by requesting the parties to submit proposed factual findings after the close of trial and then articulating its own findings and legal reasoning in a carefully crafted opinion. In many cases this is the more desirable course of action. However, the Authority ignores the benefits of the district court's approach: by issuing oral findings on the day the trial ended, the district court served the interests of the parties and the legal system in speedy adjudication. *See* Fed.R.Civ.P. 1. In addition, by announcing its findings soon after the conclusion of the trial, the district court ensured that the record was fresh on its mind, an advantage a court lacks when making findings months later. Furthermore, the overwhelming demands on a district court's time and resources also affects its ability to prepare extensive findings. For these reasons we reject the Authority's suggestion that the district court's oral findings are somehow suspect or tainted.[4]

■ We similarly reject the Authority's argument that the district court's verbatim adoption of many of Tonolli Canada's proposed factual findings contravened the purposes of Fed.R.Civ.P. 52(a) such that they do not warrant review under the clearly erroneous standard. This argument has been rejected by the Supreme Court in *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), in which the Court held that a district court's findings should receive no less deferential review when the district court announced its decision to the parties first and then asked the prevailing party to prepare findings of fact, many of which it ultimately adopted verbatim. The Court explained that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Id.* at 572, 105 S.Ct. at 1510–11.

In addition, we have squarely held that a district court's findings, when adopted verbatim from a party's proposed findings, do not demand more stringent scrutiny on appeal. *See, e.g., Hayes v. Community Gen. Osteopathic Hosp.*, 940 F.2d 54, 57 (3d Cir.1991), cert. denied, — U.S. —, 112 S.Ct. 940, 117 L.Ed.2d 110 (1992); *Hassine v. Jeffes*, 846 F.2d 169, 172 n. 1 (3d Cir.1988); *accord Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993); 51 James W. Moore, *Moore's Federal Practice* ¶ 52.06[1], at 52–127 (1993) ("it is immaterial whether [findings of fact] were drafted by the judge or by counsel").[5] While we cannot dispute that a district court's verbatim adoption of many of a party's proposed findings does not always represent a desirable practice, we are satisfied that the district court's findings here satisfy Rule 52(a) and should be upheld unless they are not supported by the evidence in the record. We note that we found no indication in the record that the district court was unfamiliar with the testimony and exhibits or that it was using the proposed findings as a crutch; if we had, we might view the matter differently. Rather, the record suggests to us that the district court's

---

4. We similarly reject the Authority's argument that the district court erred by requesting proposed findings and conclusions of law from the parties before and not after trial. Although the district court may request proposed findings of fact and conclusions of law in order to aid it in its decisionmaking process, the terms of Rule 52(a) impose no requirement that the district court do so. Rather, it is within the district court's broad discretion whether and when to request proposed findings of fact and conclusions of law, and the district court here clearly acted within the ambit of that discretion.

5. The Authority relies heavily on our decision in *Roberts v. Ross*, 344 F.2d 747 (3d Cir.1965). In *Roberts*, we accorded the district court's factual findings less weight because the district court

followed essentially the same practice utilized by the district court in *Anderson:* it first announced its decision, then requested the prevailing party to submit proposed findings, which the district court adopted verbatim. *Id.* at 752. Not only is the procedure we addressed in *Roberts* more questionable than the one followed by the district court here, but *Roberts* has been superseded by both *Anderson* and our decision in *Hayes, see supra.* We observe, too, that *Roberts* was the product of halcyon days when district court dockets were not burdened with the volume that they carry today, or with as many complex cases requiring voluminous findings. We thus reject the Authority's claim that *Roberts* requires us to review more stringently the district court's factual findings here.

findings reflected its informed and considered views.

## III. CERCLA LIABILITY FOR THE THREAT OF FUTURE CONTAMINATION

■ The district court concluded that the Authority had failed to establish that the Tonolli site posed any future threat of contamination to the Authority's wells. It therefore held that the Authority was not entitled to recover for the costs of procuring an alternative water supply or for continuously treating its existing supply. More fundamentally, in light of its subsidiary factual findings, the court determined that the Tonolli site was hydrogeologically isolated from the Authority's water production wells so that contamination on the Tonolli property would not migrate to the Authority's water supply. The Authority challenges this factual conclusion, contending that the evidence adduced at trial overwhelmingly demonstrated that heavy use of the Authority's wells would draw contamination from the Tonolli site. The Authority submits that the long-term pumping test it conducted, the AGES test, convincingly and unassailably established that there is a hydrogeological connection between the Tonolli site and its production wells and hence that the Tonolli site poses a threat of future contamination to the Authority's water. In short, the Authority submits that the district court's factual findings are clearly erroneous. We disagree.

In our view, the district court's factual determinations are well-supported by the record such that we are not "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The district court was faced in this case with extensive expert testimony offering conflicting interpretations of the reliability of the Authority's scientific study and the data it produced. The trial was thus a battle of the experts at the end of which the district court credited the interpretation of Tonolli Canada's expert rather than that of the Authority. Given that Tonolli Canada's expert provided a reasonable explanation of the scientific data

from the AGES study, we refuse to disturb the district court's factual conclusions because it is well-established that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). *See also Mendes–Silva v. United States*, 980 F.2d 1482, 1487 (D.C.Cir.1993) (in a battle of the experts, the factfinder "decide[s] the victor").

### A. *The AGES Study*

The dispute between Tonolli Canada and the Authority principally revolves around the proper interpretation of the results of the AGES test. In July, 1987, the Authority engaged an engineering firm to perform a long-term pumping test designed to determine whether contamination from the Tonolli property could affect the Authority's groundwater supply. The Authority then knew (as has been stipulated in this case) that the Authority's underground water supply was upgradient to the Tonolli site, i.e., the underground area from which the Authority's wells draw their water is higher than the groundwater area underneath the Tonolli site. Thus, under normal conditions the groundwater does not flow from the Tonolli site toward the Authority's wells. The Authority undertook the AGES study to see if long-term, continuous pumping of the Authority's wells would create a reversal of this normal trend such that contamination from the Tonolli site could infiltrate the Authority's water supply.

The AGES study was conducted over a 72–hour period. The AGES consultants installed three monitoring wells between the Tonolli site and the Authority's supply wells. The test also utilized two previously installed monitoring wells located between the Authority's production wells and the Tonolli site. For the 72–hour period, the Authority pumped its production wells at full capacity and the consultants then took two measurements: 1) the groundwater levels in the Tonolli monitoring wells, and 2) the water quality in the Authority's production and monitoring wells. According to the Authority, the theory behind this procedure was that if the water level of the Tonolli monitoring wells

dropped during the test, it would tend to prove that long-term and full-scale pumping effected a reversal in groundwater direction. Moreover, if the Authority detected higher levels of contaminants in its wells after the full-scale pumping, this, according to the Authority, would tend to prove that there was a groundwater reversal because the contaminants could have come from the Tonolli site.

At the end of the 72 hours of full-scale pumping there was a drop in two of the Tonolli monitoring wells. The water level in one well dropped by 1.74 feet; in another monitoring well, the water level fell by 1.26 feet. In addition, slightly higher levels of lead and volatile organic compounds ("VOCs") were detected after the test. The Authority thus argues that the AGES study demonstrated that at some point during the pumping test, the groundwater direction reversed. Dr. Fungaroli, the geologist in charge of the AGES test and the plaintiff's expert witness, testified that based on the results of the AGES study, he believed that the Tonolli site posed a threat of future contamination to the Authority's current water source.

B. *Dr. Earl's Testimony*

The district court's findings and conclusions are supported by the testimony of the defendant's expert, Dr. Earl, a hydrogeologist. At the outset, Earl testified that the decreases in water levels in the AGES report were minimal given the scale of the pumping test. Earl testified that the drops in the two monitoring wells after the AGES pumping test may not have been caused by the pumping and do not necessarily suggest that there was a groundwater reversal. Rather, according to Earl, the water level drops could have been caused by a wide variety of factors other than a reversal in groundwater direction. Earl related that there is no way to tell from the AGES study that the water drops were in fact caused by a reversal in groundwater flow and not by these other potential forces.

Earl detailed a number of factors that could account for the drop in the monitoring wells. For example, he testified that seasonal changes or earth tides could have resulted

in the water decreases. Earl further testified that changes in sunlight, passage of a cold or warm front, groundwater recharge events (i.e., proximity to streams or lakes where levels are rising and falling), as well as man-made influences such as nearby pumping wells and passing railroad trains, could have caused the water levels to drop as they did. In addition, he stated that some combination of those forces also may have been responsible for the drop in the monitoring wells.

Earl also criticized the AGES study for not observing and recording the trend in water levels in the wells before conducting the pumping test. He stated that the potential causes for the water level decreases that he identified would have been reflected in data about the trend of the wells' water levels before the test. Earl testified that without this pre-pumping data, there is no way to discern whether it was the pumping test or other factors which caused the drops in the water levels of the monitoring wells. Hence, according to Earl, the AGES pumping test results are inconclusive.

Earl's testimony raised questions about why the water level dropped, questions that, in his view, could have been answered had the AGES study investigated the pre-pumping water level trends in the monitoring wells. In this way, Earl's testimony provided substantial support for the district court's conclusion that the Authority had not established by a preponderance of the evidence that the pumping during the AGES test (rather than other factors) caused the water level decreases. The fact that Earl himself did not establish what caused the water levels to drop is inconsequential since Tonolli Canada, as a defendant, did not have the burden of showing the exact cause of the drop in water levels. That burden was on the Authority.

In addition to the questions Earl raised about the conclusiveness of the AGES study, his testimony also provided affirmative support for the district court's conclusion that the Tonolli site and the Authority's wells are hydrogeologically isolated. Based on the data used in the AGES study as well as a topographical survey of the area under the

Tonolli site conducted by Tonolli Canada, Earl concluded that there is a groundwater divide separating the Tonolli site and the Authority's wells. Earl also testified that because the Authority's wells draw their water from a very deep aquifer which is in a discharge zone, the Authority's wells cannot be contaminated from activity occurring at the surface level.

Earl also raised questions about the Authority's interpretations of the water quality data gleaned from the AGES study. Specifically, Earl testified that there was no reason to believe that the VOCs and lead detected in the wells after the AGES test came from the Tonolli site. Earl pointed to other possible sources, such as sediments from nearby Tippets Pond and Lake Hauto, which contain lead as demonstrated by samples taken by Tonolli Canada, and which serve as recharge sources for the aquifer that supplies water for the Authority's wells. Moreover, Earl explained that because there were VOC's present in the wells before the pumping test even began, there clearly is an upgradient source of VOCs which most likely was the source of the additional VOCs during the full-scale pumping during the AGES test.

We are satisfied that Earl's testimony regarding the water quality data adequately supports the district court's finding that the lead and the higher levels of VOC's did not come from the Tonolli site.[6] In addition, Earl's testimony as to the hydrogeological separation of the Tonolli site also supports the district court's findings regarding the water quality data, because the hydrogeological separation of the Authority's wells and the Tonolli site means, by definition, that the higher level of contaminants could not have come from the Tonolli site.[7]

### C. Conclusion

■ We hold that the district court's factual finding that the Tonolli site and the Authority's wells are hydrogeologically isolated is not clearly erroneous.[8] We thus uphold the district court's conclusion that the Authority did not sufficiently demonstrate, through the AGES test, that the Tonolli site poses any threat of contamination to the Authority's water supply.

## IV. MONITORING AND EVALUATION COSTS

### A. Background

Although we affirm the district court's order that there is no threat of future contamination by Tonolli Canada for which the Authority can recover, we must still address the Authority's doctrinally distinct claim for recovery of its monitoring and evaluation costs. CERCLA authorizes recovery for the costs of "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). It is well-established that under this provision a plaintiff can re-

6. As with the water level decreases detected by the AGES study, the fact that Earl could not identify with any precision what caused the higher level of VOC's is not determinative, since the Authority, and not Tonolli Canada, bore the burden of demonstrating by a preponderance of the evidence that the Tonolli site poses a threat of future contamination to the Authority's water supply. See supra page 1217.

7. As we have explained above, we will not disturb the district court's decision to credit the reasonable testimony of one of two competing experts. We have reviewed the testimony of the Authority's expert, Dr. Fungaroli, and while he, not surprisingly, presents a different interpretation of the data from the AGES test, we cannot say that the district court erred in its decision to reject Fungaroli's interpretation. We also note that the district court expressly stated that it found Earl's greater experience in hydrogeology made him the more credible witness. This type of credibility determination is within the sole province of the factfinder and provides further reason why we cannot say that the district court's findings were clearly erroneous.

8. We also reject the Authority's argument that the district court should have applied the "substantial factor" causation standard applied by the First Circuit in a "two site" case. Denham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146 (1st Cir.1989) (addressing situation in which two possible sites might have caused contamination). By finding that the Tonolli PA facility and the Authority's water wells are hydrogeologically isolated, the district court appropriately concluded that the decrease in water levels and the higher level of VOCs could not have been caused by the Tonolli site. We thus fail to see how the Dedham Water causation standard could apply.

cover its monitoring and evaluation costs from a release or threatened release without proving that its property was actually contaminated by the defendant. *See Artesian Water Co. v. Government of New Castle County*, 851 F.2d 643, 651 (3d Cir.1988); *accord Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1153–54 (1st Cir.1989); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.1986). Even though we uphold the district court's conclusion that the AGES study failed to establish that the Tonolli site poses any threat of future environmental harm, the Authority may still recover for the costs of the AGES study if it establishes that it incurred these costs in response to a release or threatened release of hazardous material and establishes the other elements of such a CERCLA claim.

CERCLA provides that in order to establish a prima facie case for the recovery of monitoring and evaluation costs, a plaintiff must establish that: 1) the defendant falls into one of four categories of "covered persons," 42 U.S.C. §§ 9607(a)(1)–(4); 2) there has been a release or a threatened release of a hazardous substance from a facility, 42 U.S.C. § 9607(a)(4); 3) this release or threatened release has caused the plaintiff to incur response costs, 42 U.S.C. § 9607(a)(4); and 4) the plaintiff's response costs are necessary and consistent with the NCP, 42 U.S.C. § 9607(a)(4)(B).

We note that although CERCLA authorizes recovery for monitoring and evaluation costs even when a defendant has not actually contaminated the plaintiff's property, it also provides safeguards to ensure that a defendant will be liable only in situations in which: (1) there was a reasonable risk (although one that may not materialize) that the defendant's release or threatened release of hazardous substances would contaminate the plaintiff's property; and (2) the monitoring and evaluation expenses were incurred by the plaintiff in a reasonable manner. Because a plaintiff must prove that the defendant was responsible for a release or threatened release of hazardous substances and that the costs incurred in response were both necessary and consistent with the NCP, *see*

42 U.S.C. § 9607(a)(4), these requirements prevent a plaintiff from recovering the costs incurred in instituting a needless and expensive monitoring study.

The district court held that although both a release and a threatened release of hazardous substances at the Tonolli site caused the Authority to incur monitoring and evaluation costs (the AGES study), the Authority failed to establish the other elements of a prima facie case under CERCLA. Most importantly, the district court concluded that Tonolli Canada did not qualify as a "covered person" under CERCLA, 48 U.S.C. § 9607(a)(1), because it was neither an "owner" nor an "operator" of Tonolli PA. In addition, the district court denied the Authority recovery of its monitoring and evaluation costs because the Authority presented no evidence that the costs it incurred were both necessary and consistent with the NCP.

Tonolli Canada agrees with the district court's finding that it was neither an owner nor operator of Tonolli PA, but disputes the court's finding that a release or threatened release of hazardous substances at the Tonolli site caused the Authority to incur monitoring and evaluation costs. In response, the Authority contends that there was ample evidence supporting the district court's finding that a release and a threatened release of hazardous material caused it to incur monitoring and evaluation costs, but that the district court's finding that Tonolli Canada was not an owner or operator of Tonolli PA is clearly erroneous.

B. *The Finding that a Release/Threatened Release Caused the Authority to Incur Monitoring and Evaluation Costs*

■ We reject Tonolli Canada's contention that the district court's finding that the Authority commissioned the AGES study in response to a release and threatened release of hazardous substances at the Tonolli PA site was clearly erroneous. The district court found that the negligent acts of Tonolli PA caused releases of hazardous substances into the soil at the Tonolli PA facility. It is undisputed that the federal Environmental Protection Agency (EPA) has conducted re-

moval actions under CERCLA at the Tonolli site due to a release of hazardous substances and is currently conducting a remedial investigation there under CERCLA. In addition, there was testimony at trial that the Authority was concerned about the threat of future releases because Tonolli PA had applied for a permit to dispose of hazardous wastes at its facility. Under this set of circumstances, we cannot say that the district court committed clear error in finding that the Authority, a provider of drinking water to the public, instituted the AGES study due to releases of hazardous substances and the threat of future releases at the Tonolli site. We thus decline to set aside the finding that a release and a threatened release caused the Authority to incur monitoring and response costs.[9]

### C. *"Owner" and "Operator" Status Under CERCLA*

#### 1. *Background*

Although the contours of "owner" and "operator" liability under CERCLA present an issue of first impression for this court, a number of federal courts and commentators have already considered the issue. *See, e.g., United States v. Kayser–Roth Corp.,* 910 F.2d 24 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991); *United States v. Mottolo,* 695 F.Supp. 615 (D.N.H.1988); Lynda J. Oswald & Cindy A. Schipani, *CERCLA and the "Erosion" of Traditional Corporate Law Doctrine,* 86 Nw. U.L.Rev. 259 (1992); Note, *Liability of Parent Corporations for Hazardous Waste Cleanup and Damages,* 99 Harv.L.Rev. 986 (1986). There is general agreement that under CERCLA, "owner" liability and "operator" liability denote two separate concepts and hence require two separate standards for determining whether they apply. *See, e.g., John S. Boyd Co. v. Boston Gas Co.,* 992

F.2d 401, 408 (1st Cir.1993); Richard B. Stewart & Bradley M. Campbell, *Lessons from Parent Liability under CERCLA,* 6 Nat. Resources & Env't 7 (Winter, 1992).

Under CERCLA, a corporation may be held liable as an owner for the actions of its subsidiary corporation in situations in which it is determined that piercing the corporate veil is warranted. *See Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991). Operator liability, in contrast, is generally reserved for those situations in which a parent or sister corporation is deemed, due to the specifics of its relationship with its affiliated corporation, to have had substantial control over the facility in question.[10] Courts are divided as to whether operator liability should be predicated on the actual control one corporation has over the other, or whether the corporation's capacity or authority to control is sufficient. *Compare Kayser–Roth,* 910 F.2d at 27 (applying "active involvement" test) *with Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837 (4th Cir.) (applying "authority-to-control" test), *cert. denied,* — U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992).

In this case, the district court considered whether Tonolli Canada should be deemed either an owner or an operator under CERCLA and concluded that neither status applied. The Authority argues that the district court applied incorrect legal standards in deciding these issues and that, in the alternative, even if the district court utilized the correct standards, its conclusions that Tonolli Canada is neither an owner nor an operator are clearly erroneous. We hold that the district court, by applying the "actual control" test, applied the correct legal standard

---

**9.** However, as we discuss below, *see infra* pages 1224–25, the district court's findings fail to specify *when* Tonolli PA was responsible for releasing hazardous substances into the soil at the Tonolli PA facility. As this is relevant to the operator liability issue, on remand the district court should clarify this point.

**10.** Courts have also considered the scope of operator liability under CERCLA of corporate offi-

cers, directors, and employees. *See, e.g., Riverside Market Development Corp. v. International Bldg. Prods., Inc.,* 931 F.2d 327 (5th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991); *United States v. Northeastern Pharmaceutical and Chem. Co.,* 579 F.Supp. 823 (W.D.Mo.1984), *aff'd in part and rev'd in part,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). However, we do not here address the scope of liability for such individuals.

with respect to the operator liability issue. However, because the district court's factual findings fail to address a number of key facts relevant to whether or not Tonolli Canada employees exercised control over the affairs of Tonolli PA, we will remand the case to the district court for more detailed fact findings. With respect to owner liability, we conclude that the district court applied the correct standard and properly concluded that Tonolli Canada should not be held liable as an owner. We turn first to the operator liability question because it is the more difficult issue of the two.

### 2. *Operator Liability Under CERCLA*

■ Although congressional intent may be particularly difficult to discern with precision in CERCLA, a statute notorious for its lack of clarity and poor draftsmanship, *see Artesian Water Co.*, 851 F.2d at 649, it is at least clear that Congress has expanded the circumstances under which a corporation may be held liable for the acts of an affiliated corporation such that, when a corporation is determined to be the operator of a subsidiary or sister corporation, traditional rules of limited liability for corporations do not apply.[11] This expansion of liability is consistent with CERCLA's broad remedial purposes, most importantly its "essential purpose" of making "those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created." *John S. Boyd Co.*, 992 F.2d at 405 (citing *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986)).

■ Courts have fashioned two competing standards for the imposition of operator liability: what we term the "actual control"

test and the "authority-to-control" test. Under the actual control standard, a corporation will only be held liable for the environmental violations of another corporation when there is evidence of substantial control exercised by one corporation over the activities of the other, *Kayser–Roth Corp.*, 910 F.2d at 27. In contrast, under the authority-to-control test, operator liability is imposed as long as one corporation had the capability to control, even if it was never utilized. *See Nurad*, 966 F.2d at 842; *Idaho v. Bunker Hill Co.*, 635 F.Supp. 665, 670–71 (D.Idaho 1986); *United States v. Nicolet, Inc.*, 712 F.Supp. 1193 (E.D.Pa.1989).

We reject the Authority's contention that the authority-to-control standard should govern. We believe that test sweeps too broadly and we thus adopt the actual control standard, which appears to strike the appropriate middle ground, balancing the benefits of limited liability with CERCLA's remedial purposes. Under the actual control standard, while the longstanding rule of limited liability in the corporate context remains the background norm, a corporation cannot hide behind the corporate form to escape liability in those instances in which it played an active role in the management of a corporation responsible for environmental wrongdoing. In contrast, we believe that a rule which imposes liability on a corporation which never exercised its general authority over its subsidiary or sister corporation may unduly penalize the corporation for a decision by that corporation to benefit from one of the well-recognized and salutary purposes of the corporate form: specialization of management, *see* Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U.Chi.L.Rev. 89, 90–94 (1985).[12]

---

11. CERCLA's language supports the view that corporations may be held liable for the acts of subsidiary and sister corporations, notwithstanding the traditional rule of limited liability in the corporate context. CERCLA states that an "operator" is a potentially liable party, 42 U.S.C. § 9607(a)(4). While "operator" is defined circularly as any person operating a facility, *see* 42 U.S.C. § 9601(20)(A)(ii), "person" is defined broadly to include a firm, corporation, or commercial entity, among other things, *see* 42 U.S.C. § 9601(21). CERCLA's language, therefore, indicates an intent to hold a corporation liable for the environmental violations of its subsidiaries

and sister corporations, if it is otherwise determined to have operated the facility in question.

12. We note that the position that the actual control standard establishes the appropriate intermediate ground comports with the views of a number of commentators. *See, e.g.,* Richard B. Stewart & Bradley M. Campbell, *Lessons from Parent Liability Under CERCLA*, 6 Nat. Resources & Env't 7 (Winter, 1992); Lynda J. Oswald & Cindy A. Schipani, *CERCLA and the "Erosion" of Traditional Corporate Law Doctrine*, 86 Nw. U.L.Rev. 259, 301–15 (1992).

We follow the test adumbrated in *Kayser–Roth, supra,* and *CPC Int'l, Inc. v. Aerojet–General Corp.,* 777 F.Supp. 549 (W.D.Mich. 1991). As the *Kayser–Roth* court explained, "[t]o be an operator requires more than merely complete ownership and the concomitant general authority or ability to control that comes with ownership. At a minimum, it requires active involvement in the activities of the subsidiary." 910 F.2d at 27. Whereas a corporation's "mere oversight" of the subsidiary or sister corporation's business in a "manner appropriate and consistent with the investment relationship" does not ordinarily result in operator liability, a corporation's "actual participation and control" over the other corporations's decision-making does. *CPC Int'l,* 777 F.Supp. at 573.

■■■ The determination whether a corporation has exerted sufficient control to warrant imposition of operator liability requires an inherently fact-intensive inquiry, *see John S. Boyd Co.,* 992 F.2d at 408, involving consideration of the totality of the circumstances presented. The factors courts should consider focus on the extent of the corporation's involvement in the other corporation's day-to-day operations and its policy-making decisions.[13] *See CPC Int'l,* 777 F.Supp. at 573. We understand the actual control standard to hold accountable for environmental violations those corporations which are not mere investors in other corporations, but instead have actively and substantially participated in the corporation's management.

In addition, because the essential focus of the actual control test is the control of one corporation over another, not only may a parent corporation be deemed the operator of its subsidiary, but a corporation may also be considered the operator of its sister corporation. In other words, the test is concerned with control rather than ownership and there is no reason not to hold a corporation liable when it exercises substantial management control over an affiliated corporation.

## 3. Should Tonolli Canada Be Deemed An Operator?

■■■ In view of the foregoing discussion, we reject the Authority's claim that the district court applied the wrong legal standard regarding operator liability, since it expressly applied the actual control test and manifested a correct understanding of it. We therefore review its application of that standard to the facts here for clear error only. *See John S. Boyd Co.,* 992 F.2d at 408; *Kayser–Roth,* 910 F.2d at 27. Although much of the evidence supports the district court's conclusion that Tonolli Canada should not be deemed the operator of Tonolli PA, the court's findings fail to address a number of key factual issues concerning the role of several Tonolli Canada officers in the management of Tonolli PA. The dearth of findings on these issues leaves us with important unanswered questions such that we cannot affirm the conclusion that Tonolli Canada was not an operator of Tonolli PA without further findings. Hence we will remand to the district court for additional proceedings.

The following basic facts were adduced at trial. From 1972 until 1976, Tonolli Canada was the parent and sole shareholder of Tonolli PA. In 1976, Tonolli Canada divested its Tonolli PA stock, selling it for value to IFIM, a company which also became the parent corporation to Tonolli Canada. Tonolli PA did not begin operations until September, 1975, which was only shortly before it was sold to IFIM. After Tonolli Canada sold its Tonolli PA stock, Tonolli PA and Tonolli Canada shared the same president, Elvio Del Sorbo, and the same chief financial officer, Vincent Bailini. From 1984 to 1985, the American Bank & Trust Company of Pennsylvania, a creditor of Tonolli PA, exercised strict, if not total, control over Tonolli PA's operations.

In support of its conclusion that the two corporations were largely self-supporting and

---

**13.** We agree with the *Kayser–Roth* court that evidence of control over a sister or subsidiary corporation's environmental decisions is "indicative of the type of control necessary to hold a ... corporation liable as an operator." 910 F.2d at 27 n. 8. However, operator liability may be established even without evidence that a corporation controlled the environmental decisions of an affiliated corporation as long as there exist other factors which sufficiently demonstrate pervasive control. *See id.*

self-sufficient entities during the period that Tonolli PA was operational, the district court made a number of subsidiary findings about the relationship between the two companies which support this conclusion and are supported by the record. For example, although Tonolli Canada had guaranteed Tonolli PA's financial liabilities when it was the latter's parent corporation, Tonolli Canada conditioned its sale of Tonolli PA stock to IFIM on the cancellation of these guarantees.[14] The district court also found that to the extent that Tonolli Canada had advanced money to Tonolli PA during its start-up period, these advances were all repaid by Tonolli PA shortly after it began operations in 1976. It was also established that each corporation's lead smelting process was fully operational without support from the other. In addition, each corporation owned its own equipment and procured its own supplies and raw materials. Similarly, each corporation had its own customers, sales staff, legal staff, and engineering consultants.

The district court found that the two companies were kept separate in numerous other respects: they maintained separate corporate minutes; they kept their funds and assets separate; the two companies were separately audited, producing independent financial statements. Each company paid its own bills and conversely neither accepted payment for the other's products and services provided to third parties. There was no overlap among any non-officer employees, and all facets of the companies' personnel policies were separate. All of these findings are supported by the record.

The district court also found that all financial transactions between the two companies were conducted on an arm's-length basis, including, most importantly, the annual management contracts between the two companies. The Authority has argued that the management contracts are actually strong evidence of the operational and financial unity of the two companies. However, the trial testimony established that these annual contracts—in which Tonolli PA paid Tonolli Canada for services it received—were primarily to compensate Tonolli Canada for basic services it provided during the course of a year, i.e., bookkeeping work and computer consulting. There is no indication in the record that Tonolli PA's payments pursuant to these contracts amounted to anything but the market value of the services it received. In addition, there was no other evidence that the two operated on anything but an arm's-length basis; there was, for example, no evidence that Tonolli PA was undercapitalized or that Tonolli Canada siphoned off its assets or otherwise used Tonolli PA merely as a source of cash.[15] The record, therefore, contains ample evidence supporting the district court's conclusion as to the separate nature of the two companies.[16]

However, there are several potentially significant facts that the district court's findings do not address and which we find disquieting. The two companies shared common officers during the period in question: it is uncontroverted that Del Sorbo served as president and Bailini as chief financial officer of both Tonolli PA and Tonolli Canada. On one hand, the fact that the same people served as the president and chief financial officer for the two corporations is not, without more, enough to conclude that one corporation should be deemed the operator of the other. Because a corporate officer may be a figurehead, there must be evidence that the officer actually exerted control over both corporations. On the other hand, the existence of common high-level officers is troubling and raises serious questions about the independence of the two companies.

Despite the importance of this issue, the district court failed to make any specific findings about what role Bailini and Del Sorbo played in the management of Tonolli PA. This omission is particularly problematic in

---

14. The district court found that one guarantee remained for several years after the sale to IFIM but this was due to a procedural delay caused by a bank.

15. It is uncontroverted that Tonolli PA ultimately went bankrupt due solely to the declining price of lead and not due to its relationship with Tonolli Canada.

16. The findings mentioned thus far also strongly support the district court's conclusion that Tonolli Canada was not an owner of Tonolli PA. *See infra* page 1225.

light of the fact that in 1984 Bailini signed Tonolli PA's consent order with the Pennsylvania Department of Environmental Regulation (D.E.R.), which raises questions about his involvement in Tonolli PA's environmental policies.[17] It is further disquieting in light of a document prepared by Del Sorbo containing job descriptions and describing his responsibilities as president of Tonolli PA and Tonolli Canada as well as the responsibilities of several vice-presidents. This document, which stated an effective date of January, 1979, described the two corporations operating as one entity, with the officers of both corporations reporting to the shared president, Del Sorbo. According to this document, the president served in more than a symbolic capacity, exerting final decision-making authority over all facets of the two companies' operations and management.

▮ Despite the substantial questions raised by this document, the district court made no mention of it in its findings. While it may be that the district court credited Bailini's testimony that this document was *never put into effect,*[18] we simply do not know. Given the potential import of this document, the district court erred by failing to provide an explanation of its meaning and effect on the operator liability issue.

Although the district court failed to make findings about the respective roles of Bailini and Del Sorbo in the management of Tonolli PA, it did make several findings regarding Sergio Legati. Legati was the vice-president of manufacturing of Tonolli Canada and served as Tonolli PA's plant manager during 1975–1976 (the start-up period) and again in 1984–85. Legati testified that at other times he intermittently worked on behalf of the Tonolli facility.[19] Regarding Legati's two stints as plant manager for the Tonolli facili-

ty, the district court found that, "[a]lthough Legati remained an employee of Tonolli Canada[,] .... his role was that of an individual employee temporarily on loan." Regarding Legati's part-time work for Tonolli PA, the district court found that Legati worked for the company only as a consultant.

Notwithstanding these findings about Legati, the district court's findings leave critical unanswered questions about Legati's role. More specifically, the district court failed to make any findings regarding Legati's role, if any, with respect to Tonolli PA's release of hazardous substances. Along with Bailini, Legati signed Tonolli PA's consent order with the D.E.R., raising questions about his role in environmental decisions at the Tonolli site. In addition, although the district court found that there were releases of hazardous substances into the soil at the Tonolli facility, it is unclear from both the record and the court's findings *when* the releases occurred. We thus cannot tell whether these releases occurred during the period when Legati served as a full-time plant manager for Tonolli PA. We similarly cannot tell whether they occurred when the American Bank had control over Tonolli PA.

In sum, although the district court made a number of subsidiary findings supporting its conclusion that Tonolli Canada did not exert sufficient control over Tonolli PA to be deemed an operator, its findings do not address a number of critical issues about the roles of several Tonolli Canada officers. We thus remand for the entry of more detailed findings on these issues.

4. *Should Tonolli Canada Be Deemed An Owner?*

▮ It is well-established that under CERCLA a corporation may be held liable as

---

**17.** We note, however, that the district court should make findings not only about Bailini's involvement *vel non* in the environmental decisions of Tonolli PA, but also with respect to any other way in which he participated in the management of the company. As we explained above, *see supra* note 13, a company may be considered an operator even if it did not exert control over the hazardous waste disposal decisions of an affiliated corporation, as long as there is otherwise sufficient indicia of substantial management control over the affairs of the affiliate.

**18.** There is no testimony from Del Sorbo about the meaning of this document because Del Sorbo was not called to testify.

**19.** During this entire period Legati was employed by Tonolli Canada as a vice-president of manufacturing. Legati testified that he officially remained a vice-president of Tonolli Canada even when working full-time for Tonolli PA in order to preserve his pension and other employment benefits.

the owner of another corporation when the attendant circumstances warrant piercing the corporate veil. *See, e.g., Joslyn Mfg. Co.,* 893 F.2d at 83; *John S. Boyd Co.,* 992 F.2d at 408; *United States v. Mottolo,* 695 F.Supp. 615 (D.N.H.1988). In addition, given the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs when corporate veil-piercing is justified under CERCLA. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *see also In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution,* 675 F.Supp. 22, 30–31 (D.Mass. 1987) (applying federal common law to owner/operator liability under CERCLA). *See generally* Evelyn F. Heidelberg, Comment, *Parent Corporation Liability Under CERCLA: Toward a Uniform Federal Rule of Decision,* 22 Pac.L.J. 854 (1991).

■ The Authority argues that the district court failed to recognize that operator and owner liability are predicated on different inquiries. It submits that the court therefore did not apply a separate standard to determine whether Tonolli Canada should be held liable as an owner. We disagree. We cannot dispute that the district court's discussion of the owner liability issue is somewhat vague and that at one point it misspoke by referring to the owner liability issue when it apparently meant the operator liability issue. However, based on our reading of the district court's findings of fact and conclusions of law, we conclude that the district court did in fact recognize that separate standards govern the imposition of owner and operator liability, applied the appropriate standard to determine whether Tonolli Canada should be deemed an owner, and correctly concluded that it should not.

■ It is undisputed that Tonolli Canada sold all of its stock in Tonolli PA to IFIM for value in 1976, shortly after the Tonolli PA facility commenced operations. Therefore, for the bulk of the relevant period—the period during which Tonolli PA was operational—Tonolli Canada was Tonolli PA's sister corporation and no longer its parent. While that fact is inconsequential with respect to the imposition of operator liability, it is gen-

erally relevant with respect to owner liability. Put simply, while Congress has provided little guidance in CERCLA as to the appropriate standard governing owner liability, having defined an "owner" circuitously to be any person owning a facility, 42 U.S.C. § 9601(20)(A)(ii), it is nonetheless clear that owner liability can ordinarily only attach if the defendant meets the common definition of that term and is at least a partial owner of the corporation responsible for the substantive CERCLA offenses. Thus, in contrast to operator liability, corporate ownership is generally a pre-requisite for this status to apply, and Tonolli Canada was not Tonolli PA's parent corporation for the bulk of the period in question here.

In addition, as we discussed above with respect to the operator liability issue, *see supra* pages 1222–23, the record establishes that corporate formalities were adhered to, that the two corporations entered transactions on an arm's length basis, and that Tonolli PA was not undercapitalized. Thus, there is no indication that the circumstances warranted piercing the corporate veil. We will therefore uphold the district court's conclusion that owner liability should not be imposed.

### D. *Necessity of Expenses and Consistency with the NCP*

In its response to the Authority's motion for reconsideration, the district court stated that the Authority had failed to provide any evidence that the costs it incurred for the AGES study were necessary and consistent with the NCP, two elements of a prima facie case under CERCLA. *See supra* page 1219. However, in a pre-trial order responding to a motion *in limine* by Tonolli Canada, the district court bifurcated the trial into liability and damages phases and ordered all evidence that the Authority's expenses were necessary and consistent with the NCP to be reserved for the damages phase. Given the district court's conclusions that Tonolli Canada was not liable on either count, the district court, of course, never reached the damages phase.

We accept the Authority's contention that its failure to introduce evidence that its monitoring and evaluation costs were both neces-

sary and consistent with the NCP was due to its compliance with the district court's bifurcation order. Under these circumstances, the Authority's failure to present evidence regarding necessity and consistency with the NCP is not dispositive. On remand, should the district court reach the issue of the necessity of the Authority's expenses and their conformity with the NCP, it should give the Authority opportunity to present relevant evidence.[20]

## V. IFIM'S LIABILITY

Finally, we turn to the district court's decision to enter judgment in favor of IFIM on the Authority's claim for the cost of an alternative water supply and/or treatment of its current supply, and its claim for monitoring and evaluation costs. The Authority argues that the district court erred in entering judgment in favor of IFIM since IFIM never answered the Authority's complaint, and, under Fed.R.Civ.P. 8(d), when a party fails to respond to a complaint, it is deemed to have admitted all the allegations in the complaint. Although Tonolli Canada does not represent IFIM, it points out that the Authority never moved for the entry of a default judgment, as required by Fed.R.Civ.P. 55(b)(2). The district court provided no explanation for its decision to grant judgment in favor of IFIM on either count.

■ Despite the absence of an explanation for the district court's decision, we will affirm the judgment in favor of IFIM on the Authority's claim for the costs of securing a new water supply and/or continuously treating its existing water supply because the rule requiring consistency in judgments supports this portion of the judgment. *See Frow v. De La Vega,* 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872). *See generally* 6 James W. Moore, Walter J. Taggart & Jeremy C. Wicker, *Moore's Federal Practice* ¶ 55.06 (2d ed. 1993). The district court found that the Authority's wells are not threatened by contamination from the Tonolli site due to the hydrogeological separation of the Authority's wells and the Tonolli site. This finding, of course, applies as fully to IFIM as to Tonolli Canada and means that IFIM cannot be held liable for contamination that will not occur. We will thus affirm the district court's judgment on this claim.

However, the rule against inconsistent judgments does not support the judgment in favor of IFIM on the claim for monitoring and evaluation costs because we are vacating the district court's judgment on the monitoring and response costs claim with respect to Tonolli PA. This rule is further inapplicable to this claim, at least with respect to the operator liability issue, because a conclusion about a subsidiary corporation's control over a sister company may have no bearing on the parent corporation's control over that company. Given the lack of evidence at trial either way regarding IFIM's liability, and the district court's failure to provide the reason for its judgment in favor of IFIM, we will vacate the judgment of the district court in favor of IFIM on the Authority's claim for monitoring and response costs and will remand to the district court. On remand, the district court should articulate a basis for its judgment in favor of IFIM, and, if the Authority makes a proper motion, it should consider whether the Authority is entitled to a default judgment.

## VI. CONCLUSION

For the foregoing reasons, the district court's order, to the extent that it grants judgment in favor of Tonolli Canada and IFIM on the claim for recovery for the costs of securing an alternative water supply and/or treating the water from its existing supply wells, will be affirmed. With respect to the Authority's claim against Tonolli Canada and **IFIM** for monitoring and evaluation costs, the district court's judgment will be vacated and remanded for further proceedings. Tonolli Canada has filed a cross-appeal challenging the district court's denial of its motions for sanctions against the Authority. We hold that the district court did not abuse its discretion in denying sanctions, and hence

---

**20.** We do not reach here the question whether the district court erred in postponing all evidence concerning whether the Authority's costs were necessary and consistent with the NCP to the damages phase of the trial.

the district court's judgment on that issue will be affirmed.