STEARNS & FOSTER BEDDING COMPANY, Plaintiff,

v.

FRANKLIN HOLDING CORPORATION, a New York Corporation, The Franklin Corporation—SBIC, a New York Corporation, M & T Capital Corporation, a New York Corporation, Nycon Capital Corporation, a New York Corporation, Rand Capital Corporation, a New York Corporation, R.C. Memhard & Co., a Connecticut Corporation, Stop–Fire Inc., a Delaware Corporation, Stop–Fire Inc., a New Jersey Corporation, I.M.P. Co., a New Jersey Partnership, Joseph J. McGuire, Richard C. Memhard, Vincent Protano, Martin S. Orland, Estate of Macy Nurkiewicz, Estate of Ignatius Nurkiewicz, Defendants.

Civil Action No. 94–0967.

United States District Court, D. New Jersey.

Dec. 3, 1996.

Kevin J. Bruno, Ritaelena Casavechia, Hannoch Weisman, P.C., Roseland, NJ, for Plaintiff.

Steven Gray, Waters, McPherson, McNeill, Secaucus, NJ, for Franklin Holding Corp. and The Franklin Corporation—SBIC.

Daniel M. Darragh, Buchanan Ingersoll, A Professional Corporation, Pittsburgh, PA, and David S. Garber, Princeton, NJ, for M & T Capital Corp.

Alfred C. Constants, III, Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, Roseland, NJ, for NYCON Capital Corp.

Alice J. Kryzan, Kryzan & Kolaga, L.L.P., Buffalo, NY, and Thomas E. Hastings, Smith, Stratton & Brennan, Princeton, NJ, for Rand Capital Corporation.

James E. Berube, Jr., Little Silver, NJ, for Stop–Fire Inc. and Joseph J. McGuire.

Richard C. Memhard, R.C. Memhard & Co., Riverside, CT, pro se.

Jeffrey Gerber, Bressler, Amery & Ross, P.C., Florham Park, NJ, for Estate of Macy Nurkiewicz, Estate of Ignatius Nurkiewicz, I.M.P. Co.

Lawrence S. Lawrence, Lawrence & Walsh, Hempstead, NY, and Russell M. Woods, Woods and Trembulak, Cranford, NJ, for Martin S. Orland.

Table of Contents

I. FACTS AND PROCEDURAL HISTORY ....... 795
II. STANDARD FOR SUMMARY JUDGMENT ....... 796
III. DISCUSSION ....... 797
 A) Private Party Actions Under CERCLA Section 107(a) ....... 797
 B) Operator Liability Under CERCLA ....... 801
 (1) Introduction ....... 801
 (2) The Actual Control Standard ....... 802
 (3) Franklin's Operator Liability ....... 803
 (4) M & T's Operator Liability ....... 807
 (5) Rand's Operator Liability ....... 808
 (6) Agency Liability of M & T and Rand ....... 809
 C) The Continuity of Enterprise Theory ....... 809
 D) The New Jersey Spill Act ....... 810
 E) Martin S. Orland's Motion for Summary Judgment ....... 811
 F) NYCON's Motion for Summary Judgment ....... 812
 G) The Nurkiewicz Defendants' Motion to Approve Settlement ....... 813
 H) The Motions to Strike ....... 814
IV. CONCLUSION ....... 815

OPINION

ORLOFSKY, District Judge:

This action has been brought by Stearns & Foster Bedding Corp. ("Stearns & Foster"), a manufacturer of mattresses and box springs, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675, and the statutory and common law of New Jersey. In Count One of its Third Amended Complaint, plaintiff seeks to recover response costs under CERCLA Section 107(a), 42 U.S.C. § 9607(a), in relation to pollution remediation activities undertaken at a facility currently owned by Stearns & Foster. In Count Two, plaintiff seeks contribution under CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1). Stearns & Foster also seeks contribution pursuant to the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.Stat.Ann. § 58:10–23.11f(a)(2), as well as damages and equitable relief under the common law of New Jersey. Several defendants have filed counterclaims against Stearns & Foster and cross-claims seeking indemnity and/or contribution. Jurisdiction is conferred upon this court by 28 U.S.C. §§ 1331 and 1367(a).

There are no fewer than nine motions and cross-motions presently before the court. Defendants, Franklin Holding Corp. and the Franklin Corp.—SBIC (collectively "Franklin"), have filed a motion for summary judgment. Defendant, M & T Capital Corp. ("M & T"), has filed a motion for summary judgment. Defendant, Rand Capital Corp. ("Rand") has filed a motion for summary judgment. Defendant, Martin S. Orland ("Orland"), seeks summary judgment dismissing Counts One through Eight of the Third Amended Complaint as against him.

Defendant, NYCON Capital Corp. ("NYCON"), has filed a motion for summary judgment. In addition, plaintiff, Stearns & Foster, has moved for partial summary judgment on the issue of CERCLA liability against defendants, Franklin Holding Corp., M & T Capital Corp. and Rand Capital Corp.

On separate issues, defendants, I.M.P. Co., the Estate of Ignatius Nurkiewicz and the Estate of Macy Nurkiewicz (the "Nurkiewicz defendants"), have filed a motion to approve a settlement with Stearns & Foster and to dismiss with prejudice the cross-claims of the other defendants. Two of the defendants, M & T and Rand, have filed motions seeking to strike the certifications of Jose Morera, Carmelo Figueroa, and Oscar Franz and the affidavits of George Gilkie, Peter Edmonds, and Steven Morabito, all of which have been presented in support of Stearns & Foster's motion for partial summary judgment.

These motions require this court to decide: (1) whether a plaintiff, who is also a potentially responsible party under CERCLA, may sue for response costs under Section 107; (2) whether the summary judgment record supports the imposition of CERCLA liability upon any, or all, of the companies which provided capital to Stop Fire–DE and Stop Fire–NJ, because these companies actually controlled the day-to-day operations of Stop Fire–DE and Stop Fire–NJ at a time when hazardous waste disposal took place; (3) whether Stop Fire–NJ is responsible for any CERCLA liability which attaches to its predecessor companies, Stop Fire–NY and Stop Fire–DE; (4) whether Franklin's Executive Vice President, Martin S. Orland, may be held personally liable for contamination at the Site; and (5) whether affidavits and certifications filed after the close of discovery may be considered in the summary judgment record in this case.

## I. Facts and Procedural History

As is typical in CERCLA actions, the facts are largely undisputed, although the legal conclusions to be drawn from those facts are vigorously contested. This case concerns responsibility for environmental pollution at a twenty-one acre site in South Brunswick, New Jersey, now owned by Stearns & Foster (the "Site"). Until November, 1979, the Site was used primarily for the manufacture of fire extinguishers under the brand name "Stop-Fire." From 1979 until 1991, the Site was used by Stearns & Foster for its bedding manufacturing operations.

The Site, then a farm, was purchased in 1953 by the Ashwill Corporation, a New York holding company owned by Ignatius, Macy and Paul Nurkiewicz. Ashwill Corporation was dissolved on August 24, 1970, and ownership of the Site was transferred to I.M.P. Company, a New Jersey Partnership formed by Ignatius, Macy and Paul Nurkiewicz. While the Site was owned by the Nurkiewiczes, the fire extinguisher manufacturing operations were conducted by a series of companies using the "Stop–Fire" brand name, beginning with Union Parts Manufacturing Company ("Union") and Stop Fire, Inc., a New York Corporation ("Stop Fire–NY").

Union and Stop Fire–NY were purchased in September, 1973, by a newly-formed Delaware corporation, Stop Fire, Inc. ("Stop Fire–DE"). Financing for the purchase was provided to Stop Fire–DE by Franklin and M & T. Additional financing was provided to Stop Fire–DE in 1975, by Franklin, M & T and Rand (the "Investor Group").

Pursuant to Bankruptcy Rules then in effect, Stop Fire–DE was adjudicated a bankrupt by a consent order entered in this court on April 23, 1976. On May 19, 1976, Stop Fire, Inc., was newly incorporated as a New Jersey corporation ("Stop Fire–NJ"). On June 3, 1976, Franklin, acting for itself and on behalf of M & T, purchased the physical assets of Stop Fire–DE from the bankruptcy trustee. On the following day, June 4, 1976, Franklin and M & T transferred these physical assets to Stop Fire–NJ.

On June 7, 1989, pursuant to provisions of New Jersey's Environmental Cleanup Responsibility Act ("ECRA"),[1] Stearns & Foster entered into an Administrative Consent Order ("ACO") with the New Jersey Depart-

---

1. ECRA was substantially amended in 1993, and is now known as the Industrial Site Recovery Act. *See* N.J.Stat.Ann. §§ 13:1K–6 to 1K–13 (West Supp.1996).

ment of Environmental Protection ("NJDEP") which required Stearns & Foster to determine the nature and extent of soil and groundwater contamination at the site and to implement remedial measures. As a result of its investigations, Stearns & Foster discovered, among other problems, some soil and extensive groundwater pollution from chlorinated solvents.[2]

Stearns & Foster contends that it never used chlorinated solvents in its manufacturing process. On the other hand, it is undisputed that, as part of the fire extinguisher manufacturing process, the various Stop Fire entities utilized chemical degreasers containing chlorinated solvents in order to prepare canisters and other metal parts for painting. There is undisputed testimony that, on at least one occasion, employees of Stop Fire emptied drums onto the ground at the Site. It is assumed, for purposes of these motions, that those drums contained solvents from the parts cleaning process. It is contended by Stearns & Foster, and supported by affidavit testimony, that such disposal of solvents continued throughout the tenure of the various Stop Fire entities at the Site.

The investor companies, Franklin, M & T and Rand, vigorously dispute the assertion that solvents were dumped at any time during which they were in any way connected with the Site and have moved to strike the affidavits and certifications which Stearns & Foster has presented in support of this contention.

## II. Standard for Summary Judgment

The standard for summary judgment requires that this court view the underlying facts and all reasonable inferences arising from those facts in the light most favorable to the party opposing the motion. *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995) (citation omitted); *see also Helen L. v. DiDario,* 46 F.3d 325, 329 (3d Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995); *Valhal Corp. v. Sullivan Assocs., Inc.,* 44 F.3d 195, 200 (3d Cir.1995); *Goodman v. Mead Johnson & Co.,* 534 F.2d

566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

Summary judgment should be granted only if this court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The district court must grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir.1996).

The party may seek summary judgment on an issue on which its adversary will bear the burden at trial, by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). There is no requirement that the moving party "support its motion with affidavits or similar materials *negating* the opponent's claim." *Id.*

Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1361 (quoting Fed.R.Civ.P. 56(e)) (emphasis added in *Matsushita*). When challenged on an essential element of its claim, the non-movant must present evidence in support of its claim in order to survive summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

The question for this court, then, is whether the opponents of summary judgment have presented sufficient evidence to create a dispute regarding a genuine issue of material fact, viewing the evidence in the light most favorable to them. *Gottshall v. Consolidated Rail Corp.,* 56 F.3d 530 (3d Cir.1995); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122

---

**2.** There is also evidence in the record of contamination from sources which are, at least potential-

ly, not associated with the Stop Fire manufacturing process.

L.Ed.2d 659 (1993); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1381 (3d Cir.1991). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted).

### III. Discussion

#### A) Private Party Actions Under CERCLA Section 107(a)

Stearns & Foster asserts two independent causes of action against the defendants under CERCLA. First, Stearns & Foster seeks to maintain a direct, private party cost recovery action against the defendants under 42 U.S.C. § 9607(a) (CERCLA Section 107(a)) to secure reimbursement for "all legally recoverable response costs incurred or to be incurred by Stearns & Foster." Third Amended Complaint, Count One, ¶ 101(a). Second, Stearns & Foster seeks, apparently in the alternative, to maintain an action against the defendants under 42 U.S.C. § 9613(f) (CERCLA Section 113(f)) to recover "[c]ontribution for all response costs incurred or to be incurred by Stearns & Foster." Third Amended Complaint, Count II, ¶ 108(a).

Section 107(a) of CERCLA states, in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a).

Under Section 107 of CERCLA, a plaintiff must meet four elements to establish liability: (1) that a hazardous substance was disposed of at a "facility;" (2) that there has been a "release" or a "threatened release" of a hazardous substance from the facility into the environment; (3) that the release or threatened release has required or will require the expenditure of "response costs;" and (4) that the defendant falls within one of four categories of responsible parties. 42 U.S.C. § 9607(a); *see United States v. CDMG Realty Co.*, 96 F.3d 706, 711–12 (3d Cir.1996) (To be reported at: 96 F.3d 706). If these four requirements are met, a responsible party may be held liable for response costs under § 9607(a) regardless of intent. *See United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 259 (3d Cir.), *reh'g and reh'g in banc denied*, 964 F.2d 271 (3d Cir.1992)

("CERCLA imposes strict liability on responsible parties."). Furthermore, unless the defendants can prove that the harm is "divisible," liability under Section 107 is joint and several.

Section 113 states, in pertinent part:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under ... section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under ... section 9607 of this title.

42 U.S.C. § 9613(f)(1).

As a preliminary matter, this court must decide whether Stearns & Foster may maintain a cost recovery action under Section 107, or whether, as defendants contend, it is limited to a contribution action under Section 113(f). The basic difference between these causes of action is that, in Stearns & Foster's Section 107(a) cause of action, it is attempting to hold the defendants liable "jointly and severally" for its total response costs, whereas its Section 113(f) cause of action can only result in each defendant's "several" liability for its portion of the total response costs, calculated according to "such equitable factors as the court determines are appropriate."

The question whether one Responsible Party ("RP"), or Potentially Responsible Party ("PRP"),[3] can sue another under Section 107 has not been addressed by the United States Court of Appeals for the Third Circuit. However, among the district courts, within and without this district, the issue has been frequently addressed, and has been resolved in diametrically opposing fashions. Some courts have held that a PRP can sue another PRP under Section 107, and the defendant PRPs will be held "jointly and severally" liable, if the plaintiff prevails. *See Bethlehem Iron Works, Inc. v. Lewis Industries, Inc.,* 891 F.Supp. 221 (E.D.Pa.1995); *Companies for Fair Allocation v. Axil Corp.,* 853 F.Supp. 575 (D.Conn.1994); *City of North Miami v. Berger,* 828 F.Supp. 401, 407 (E.D.Va.1993). *United States v. Kramer,* 757 F.Supp. 397 (D.N.J.1991). The majority of district courts, however, reason that an action instituted by a PRP, no matter how it is denominated, is essentially one for contribution and is governed by Section 113. *See Borough of Sayreville v. Union Carbide Corp.,* 923 F.Supp. 671, 677–79 (D.N.J.1996); *see also Reynolds Metals Co. v. Arkansas Power & Light Co.,* 920 F.Supp. 991 (E.D.Ark.1996); *Kaufman and Broad–S. Bay v. Unisys Corp.,* 868 F.Supp. 1212 (N.D.Cal.1994); *Folino v. Hampden Color Chem. Co.,* 832 F.Supp. 757 (D.Vt.1993); *Transtech Indus. v. A & Z Septic Clean,* 798 F.Supp. 1079 (D.N.J.1992), *appeal dismissed,* 5 F.3d 51 (3d Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994); *Gould Inc. v. A & M Battery and Tire Service,* 901 F.Supp. 906 (M.D.Pa.1995); *United States v. Bay Area Battery,* 895 F.Supp. 1524 (N.D.Fla.1995).

The four Circuit Courts of Appeals that have squarely addressed this issue have uniformly denied PRPs a Section 107 cause of action. *See United States v. Colorado & Eastern R.R. Co.,* 50 F.3d 1530, 1539 (10th Cir.1995) ("[C]laims between PRPs to apportion costs between themselves are contribution claims pursuant to Sect. 113 regardless of how they are pled...."); *United Technologies Corp. v. Browning–Ferris Industries.,* 33 F.3d 96, 100 (1st Cir.1994) ("The statutory language ... suggests that cost recovery and contribution actions are distinct and do not overlap."), *cert. denied,* — U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Akzo Coatings v. Aigner Corp.,* 30 F.3d 761, 764

---

**3.** As the current owner of the Site, Stearns & Foster is, at the very least, a potentially responsible party under CERCLA. 42 U.S.C. § 9607(a)(1). This court need not, and does not decide at this time whether Stearns & Foster is responsible for any discharge of hazardous substances at the Site.

(7th Cir.1994) ("Whatever label Akzo may wish to use, its claim remains one by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make."); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir.1989) ("When one liable party sues another to recover its equitable share of the response costs, the action is one for contribution....").

Plaintiff relies on the Supreme Court's decision in *Key Tronic Corp. v. United States*, 511 U.S. 809, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994), in which the Court noted in passing that CERCLA "now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107." *Id.*, 511 U.S. at ——, 114 S.Ct. at 1966. In suggesting that the Court's *dicta* in *Key Tronic* indicates that a PRP may simultaneously pursue an action under Sections 107 and 113, the plaintiff greatly overstates the importance of the Court's observation. In *Key Tronic*, the Court was addressing whether 1.2 million dollars in attorney's fees were recoverable under Section 107. The Court held that those fees which were closely related to the actual cleanup were recoverable under Section 107. *Id.*, 511 U.S. at ——, 114 S.Ct. at 1967. This was the only issue actually presented to the Court in *Key Tronic*.

Moreover, a review of several cases decided since *Key Tronic* reveals that courts have not interpreted the Supreme Court's *dicta* as establishing joint and several liability of a PRP in a suit brought by another PRP under § 107. *See, e.g., SC Holdings, Inc. v. A.A.A. Realty Co.*, 935 F.Supp. 1354 (D.N.J.1996); *Gould Inc. v. A & M Battery and Tire Service*, 901 F.Supp. 906 (M.D.Pa.1995), *New Castle County v. Halliburton NUS Corp.*, 903 F.Supp. 771 (D.Del.1995); *Plaskon Electronic Materials v. Allied–Signal* 904 F.Supp. 644 (N.D.Ohio 1995).

In *Borough of Sayreville*, 923 F.Supp. at 680, Judge Lechner addressed and rejected the identical argument that has been advanced by the plaintiff in this case based upon *Key Tronic*, noting that the issue of whether a PRP could sue another PRP under Section 107 was not before the Supreme Court in *Key Tronic*. Indeed, as Judge Lechner points out, any question of "joint and several" liability had been resolved in the district court when the parties "stipulated to the quantum of liability for [the contested response costs]." *Key Tronic Corp. v. United States*, 766 F.Supp. 865, 868 n. 1 (E.D.Wash.1991). I am persuaded by the logic of the numerous cases which conclude that it was not the Supreme Court's intention in *Key Tronic* to comment on the viability of a PRP's action under Section 107.

Plaintiff also relies upon *United States v. Kramer*, 757 F.Supp. 397 (D.N.J.1991), in which Chief Judge Gerry allowed the United States of America, in the circumstances of that case a PRP, to maintain an action under Section 107, reasoning that allowing such a cause of action would create an incentive for private parties to clean up hazardous waste sites expeditiously, in order to enjoy the temporary windfall provided by Section 107's provision for "joint and several" liability. *Id.* at 416–17. Although the search for incentives to promote aggressive clean-ups of toxic waste certainly accords with the overall goals of CERCLA, many courts have criticized the *Kramer* holding on the grounds that this Section 107(a) "windfall" is far too ephemeral to have any meaningful effect on the behavior of PRPs. After all, any PRP who recovers a share of response costs which, by rights, he should have paid himself, will face a Section 113 action by the defendant from whom he collected this "windfall." *See Borough of Sayreville*, 923 F.Supp. at 679 n. 12; *Kaufman and Broad–S. Bay v. Unisys Corp.*, 868 F.Supp. 1212, 1215 n. 2 (N.D.Cal. 1994) ("The problem with [the *Kramer*] argument is that the 'windfall' incentive is illusory."). Indeed, a PRP who recovers such a "windfall" could conceivably face a return volley under Section 107 by the defendant who has overpaid. One district court has opined that the *Kramer* approach "guarantees inefficiency, potential duplication, and prolongation of the litigation process." *T H Agric. & Nutrition Co. v. Aceto Chem. Co.*, 884 F.Supp. 357, 361 (E.D.Cal.1995).

Three recent cases in this district provide further support for the defendants' interpretation of CERCLA. In *SC Holdings, Inc. v.*

*A.A.A. Realty Co.,* Judge Brown collected numerous cases limiting PRPs to an action under Section 113, and ultimately chose to follow what he termed "[t]he majority rule." *Id.,* 935 F.Supp. at 1362. Likewise, in *Caldwell Trucking PRP Group v. Spaulding Composites Company, Inc.,* No. 94 Civ. 3531, 1996 WL 608490 (D.N.J. April 22, 1996), the court dismissed the plaintiffs' Section 107 claim and limited the defendant's potential liability to contribution under Section 113. In *General Electric Co. v. Buzby Bros. Materials Corp.,* No. 87–4263, mem. order 1996 WL 608488 (D.N.J. June 20, 1996), Judge Rodriguez followed *Caldwell Trucking* and other recent cases in dismissing Section 107(a) claims brought by a PRP.

It is noteworthy that cost recovery actions under Section 107(a) carry a six-year statute of limitations, while contribution actions under Section 113(f) carry a three-year limitation period. It is unlikely that Congress would have intended that a PRP could avoid the three-year limitation contained in Section 113(f) by recasting its contribution action as a cost recovery action under Section 107(a). *See United Technologies,* 33 F.3d at 101 (An "expansive reading of section 9607 ... would completely swallow section 9613(g)(3)'s three-year statute of limitations associated with actions for contribution.").

Ironically, both sides in the debate over whether Section 107(a) provides a cause of action for cost recovery to PRPs claim to be serving the "plain meaning" of CERCLA. Some courts focus on Section 107(a)(4)(B), refusing to "engraft" the word "innocent" on to the phrase "any other person." *See, e.g., Adhesives Research Inc. v. American Inks & Coatings Corp.,* 931 F.Supp. 1231, 1239 (M.D.Pa.1996) ("The court finds no reason to give the phrase 'any other person' other than its plain meaning."). Other courts concentrate on Section 113, asking why the word "contribution" in that section should not include all actions between parties with shared liability. *See, e.g., United Technologies,* 33 F.3d at 103 ("The word 'contribution' for purposes of 42 U.S.C. § 9613(f) should be given its plain meaning."); *see also In the Matter of Reading Co.,* 900 F.Supp. 738, 748 (E.D.Pa.1995) (same).

Some district courts, even though perhaps unmoved by *Kramer*'s "windfall" argument, still adopt the view that Section 107(a) provides a cause of action for cost recovery to PRPs, in part, because they believe that cleanups " 'may be discouraged' " if a PRP " 'knows that, where the harm is indivisible, its only recourse for reimbursement is contribution from solvent PRPs.' " *Companies for Fair Allocation v. Axil Corp.,* 853 F.Supp. 575, 579 (D.Conn.1994) (quoting *Allied Corp. v. Acme Solvents,* 691 F.Supp. 1100, 1118 (N.D.Ill.1988)).

The concern expressed by these courts is that a PRP would not undertake a voluntary cleanup if faced with the risk of being unable to recover cleanup costs expended beyond its equitable share and attributable to absent or insolvent PRPs, so-called "orphan shares." *See Adhesives Research,* 931 F.Supp. at 1244 (citing *Pinal Creek Group v. Newmont Mining Corp.,* 926 F.Supp. 1400, 1408 (D.Ariz. 1996)). This is essentially the same argument advanced by Stearns & Foster. *See* Plaintiff's Brief in Support of Summary Judgment at 44.

To arrive at this conclusion, however, courts stretch the meaning of "plain meaning." For example, in *Pinal Creek,* having adopted the view that a PRP may sue under Section 107(a), the court opined that it might, nevertheless, be proper to deny standing to a PRP who brought an action under Section 107 "merely to circumvent contribution protection granted by the government to another party pursuant to Section 113(f)(2), or to avoid the shorter statute of limitations for contribution actions." *Pinal Creek,* 926 F.Supp. at 1409. However, the court found that the plaintiffs in the case before it were not attempting "to circumvent contribution protection or to avoid the shorter limitations period," but were merely seeking to "shift many of the legal and financial risks associated with their cleanup." *Id.* This, in effect, amounts to saying that the "plain meaning" of Section 107(a)'s "any other person" language does not mean "any other *innocent* person," but instead, means "any other person *who is not attempting to avoid the contribution protection or statute of limitations provisions of Section 113.*"

Moreover the danger that a PRP will be unable to recover the "orphan shares," absent Section 107's provision for joint and several liability, is a statutory "paper tiger." Several courts have recognized that the powers provided by § 113(f)(1) allow district courts "to allocate any 'orphan shares' among viable PRPs, with the result that each viable PRP's allocable share may include a portion of whatever 'orphan shares' there are." *Town of New Windsor v. Tesa Tuck, Inc.,* 919 F.Supp. 662, 681 (S.D.N.Y.1996). Similarly, in *Caldwell Trucking,* Judge Bassler noted that the apportionment of "orphan shares" was "an equitable issue that is more relevant to the quantum of [defendant's] liability than the fact of it." *Caldwell Trucking,* slip op. at 3 n. 2, 1996 WL 608490.

Certainly, the position urged by the defendants will mean that Section 107(a) private party plaintiffs will be few and far between. Truly innocent private party plaintiffs would be limited to, for example, a neighbor of a contaminated site who has acted to stem threatened releases for which he is not responsible, *see Akzo,* 30 F.3d at 764, or a party who can claim one of the complete defenses set forth in 42 U.S.C. § 9607(b).[4] Few others would escape CERCLA's strict liability scheme.

■ I agree with the majority position. The residual power granted to a district court in Section 113 to apportion liability according to equitable principles more than adequately protects a PRP who undertakes a clean-up of another party's toxic legacy. Moreover, it seems fundamentally unfair to allow one PRP to burden all the other PRPs, as named defendants in its Section 107(a) action, with joint and several liability for the entire harm unless those defendants can demonstrate that the harm is divisible, a difficult proposition at best, simply because

the first PRP won the race to the courthouse door. For all the reasons set forth in this opinion, therefore, I conclude that Stearns & Foster may not proceed with an action under Section 107(a) unless it can demonstrate that it is an "innocent" party.

## B) Operator Liability Under CERCLA

### (1) Introduction

In order to prevail on its claim for contribution under Section 113, Stearns & Foster must fit each defendant within one or more of the four categories of "responsible parties" set forth in the statute. *See* 42 U.S.C. § 9607(a). Stearns & Foster alleges that Franklin, M & T and Rand are liable as "operators" of a "facility" during the time of the disposal under § 9607(a)(2). More specifically, Stearns & Foster alleges that the Investor Group's dealings with Stop Fire–DE and Stop Fire–NJ between 1973 and 1978 render each of them liable as "operators" under CERCLA.

Stearns & Foster does not seek to impose derivative liability on any of the Investor Group as "owners." In order to do so, Stearns & Foster would need to show that the circumstances warranted "piercing the corporate veil." As the Third Circuit has stated:

"[A] corporation may be held liable as an owner for the actions of its subsidiary corporation in situations in which it is determined that piercing the corporate veil is warranted. Operator liability, in contrast, is generally reserved for those situations in which a parent or sister corporation is deemed, due to specifics of its relationship with its affiliated corporation, to have had substantial control over the facility in question."

4. These defenses are strictly limited to:
 (1) an act of God;
 (2) an act of war;
 (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned,

taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
 (4) any combination of the foregoing paragraphs.
42 U.S.C. § 9607(b).

*Lansford–Coaldale Water Auth. v. Tonolli Corp.,* 4 F.3d 1209, 1220 (3d Cir.1993). It is the latter standard, also known as the "actual control" standard, which Stearns & Foster contends is applicable to the facts of this case, *i.e.,* that the various corporate investors are "operators" within the meaning of CERCLA.[5]

The inquiry into "substantial control" requires this court to "look to the extent of the defendant[s]' . . . participation in the alleged wrongful conduct." *Riverside Market Development Corp. v. International Bldg. Products, Inc.,* 931 F.2d 327, 330 (5th Cir.), *cert. denied,* 502 U.S. 1004, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991). In this case, the court must assess whether the defendants' level of involvement in the day-to-day management of the Stop Fire entities in which they invested warrants a finding that the defendants were "operators" within the meaning of CERCLA. Stearns & Foster has added a novel twist to this inquiry by seeking to impose liability upon defendants, M & T and Rand, regardless of their level of actual involvement with the Stop Fire companies, based upon agency principles. Under this theory, Stearns & Foster contends that Franklin was an agent for M & T and Rand, and therefore, M & T and Rand are equally responsible, as principals, for the actions of their agent.

### (2) The Actual Control Standard

In *United States v. Kayser–Roth Corp.,* 910 F.2d 24 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), the First Circuit explained the two theories under which a parent corporation, or sibling corporation, may be held responsible for the CERCLA liability of its related company. The first theory is that the "safe harbor" provisions for secured creditors contained in § 9601(20)(A), by using the phrase "without participating in the management of a . . . facility," imply that a person who holds indicia of ownership, *e.g.,* a stockholder, as in *Kayser–Roth,* may be held liable without regard to its involvement in the entire operation, if it participated in the management of the facility at issue. *Kayser–Roth's* second theory is that any person or entity associated with a facility, whether holding indicia of ownership or not, may be deemed an "operator" if that person or entity actually controlled the facility's operation and management.

In *Lansford–Coaldale,* the Third Circuit rejected the so-called "authority to control" test for imposing CERCLA "operator" liability, under which a related company would be liable if it "had the capability to control, even if it was never utilized." *Id.* at 1221. Instead, the Third Circuit adopted the second *Kayser–Roth* theory, the "actual control" standard, which requires " 'actual participation and control' over the other corporations's [sic] decision-making." *Id.* at 1222 (quoting *CPC Int'l v. Aerojet–General Corp.,* 777 F.Supp. 549 (W.D.Mich.1991)).

A defendant lender bears the burden of securing a berth in the safe harbor created by § 9601(20)(A)'s "without participating in management" language, whereas it is plaintiff's burden to demonstrate that "operator" liability should attach to a related company because of its "actual control" of the subject entity. Although "participating in management" seemingly implies less involvement than "actual control" over management and operations, it is not clear that this distinction can be reasonably drawn from the statute. Indeed, it would seem more likely, given the Congressional concern that CERCLA liability imposed on lenders would adversely impact the availability of capital, that a stricter test would apply to lender liability than to the liability of a related company.[6]

---

5. The statute gives little guidance. By a perfect tautology, CERCLA defines an "owner or operator" as "any person owning or operating" a facility. 42 U.S.C. § 9601(20)(A)(ii).

6. For some discussion of this concern in the wake of court decisions imposing liability on lenders, see S.Rep. No. 349, 103d Cong., 2d Sess. (August 19, 1994), and H.R.Rep. No. 582(I), 103d

Cong., 2d Sess. (June 30, 1994), considering proposed amendments to CERCLA. Amendments much like those discussed in these Congressional reports, aimed at providing greater protection to lenders under CERCLA, were recently enacted. *See* Omnibus Consolidated Appropriations Act of 1997, Pub.L. 104–208, §§ 2501–2505, 110 Stat. 3009 (Sept. 30, 1996). In particular, the Act effectively reinstates EPA's lender liability rule,

Regardless of the Congressional intent, however, by adopting the "actual control" standard in *Lansford–Coaldale*, the Third Circuit has eliminated any meaningful distinction which might exist, for example, in a circuit which applies an "authority to control" standard to related companies, but must still apply a "participation in management" standard to secured lenders seeking an exemption under § 9601(20)(A). Accordingly, I conclude that a secured creditor, which establishes that it has not "participated in management," cannot be held liable under the *Lansford–Coaldale* "actual control" standard. Similarly, those cases which discuss the criteria for "participation in management" under § 9601(20)(A), also implicitly inform this court's inquiry into what constitutes "actual control" of a related company.

For at least some part of the time period at issue, 1973–1978, the members of the Investor Group acted only as secured creditors of one or more of the Stop Fire entities. Indeed, M & T moves for summary judgment and opposes Stearns & Foster's motion for summary judgment, by contending that it fits within the secured creditor exemption set forth in § 9601(20)(A).[7]

### (3) Franklin's Operator Liability

Stearns & Foster asserts that Franklin is liable as an "operator," of both Stop Fire–DE and Stop Fire–NJ. Franklin contends that its actions in relation to the Stop Fire entities do not amount to "actual control" under the standard enunciated in *Lansford–Coaldale*. To unravel this dispute, this court is required to decide whether Franklin's actions, at any time during its relationship with Stop Fire–DE or Stop Fire–NJ, constituted actual and substantial control over the relevant Stop Fire entity, and, if so, for what period of time.

The "actual control" determination "requires an inherently fact-intensive inquiry, involving consideration of the totality of the circumstances presented." *Lansford–Coaldale*, 4 F.3d at 1222 (citation omitted). This court must "focus on the extent of the defendant's involvement in the [Stop Fire entities'] day-to-day operations and its policy-making decisions." *Id.* In this regard, actual control over the "environmental decisions" of the Stop Fire entities is not necessary to incur CERCLA liability, "as long as there exist other factors which sufficiently demonstrate pervasive control." *Id.* at 1222 n. 13 (citing *Kayser–Roth*, 910 F.2d at 27 n. 8).[8]

On November 21, 1973, Franklin invested $350,000.00 in Stop Fire–DE which formed part of the capital used to purchase the assets of Union Parts and Stop Fire–NY.[9] In return for its investment, Franklin received a security interest in equipment, certain warrants to purchase stock, and one seat on the seven member Board of Directors of

---

see 57 Fed.Reg. 18344, now withdrawn, which had set forth criteria by which the agency would determine a lender's "participation in management." *See* Omnibus Consolidated Appropriations Act of 1997, Pub.L. 104–208, § 2502(b), 110 Stat. 3009 (1996) (to be codified at 42 U.S.C. 9601(20)(E)).

While these amendments lend some support to the contentions of M & T and Rand, they are not critical to this court's analysis. Because Stearns & Foster has failed to establish the "operator" liability of either M & T or Rand, and has chosen to base its summary judgment motion upon the alleged "operator" liability of M & T and Rand, it is unnecessary to discuss the effect, if any, of the recent amendments to 42 U.S.C. § 9601(20) on lender liability.

**7.** The summary judgment defendants uniformly assert that no discharge of hazardous substances occurred during their association with the Stop Fire entities. Liability under CERCLA only at-

taches to a "person who at the time of disposal" was an "operator." 42 U.S.C. § 9607(a)(2). Therefore, Stearns & Foster cannot succeed unless it can demonstrate that hazardous waste disposal took place at the time that the Investor Group, or its individual members, allegedly operated the Site.

**8.** Franklin and Stearns & Foster are in apparent agreement that there is no direct evidence that any representative of Franklin had actual control over the environmental decisions of the Stop Fire entities. *See* Franklin's Brief in Support of Summary Judgment at 21; Plaintiff's Brief in opposition to Defendants' Motions for Summary Judgment at 8 n. 5. The parties' dispute, therefore, is limited to whether the facts support a finding of "pervasive control."

**9.** Another $350,000.00 was invested by M & T and $150,000.00 by Rand. NYCON contributed the remainder, which was secured by Stop Fire–DE's accounts receivable.

the newly-formed Stop Fire–DE.[10] Stearns & Foster alleges that, for approximately the next two years, Franklin attended board meetings at Stop Fire's plant, and elsewhere, and periodically hosted board meetings at its headquarters. As evidence of "actual control," Stearns & Foster alleges that, at a December 3, 1975, meeting, the three investor companies "unilaterally determined to place [Stop Fire–DE] into bankruptcy." Plaintiff's Brief at 52. A resolution of the Board of Directors approved the bankruptcy filing on December 9, 1975.[11]

On January 13, 1976, Franklin and M & T exercised their warrants, becoming shareholders in Stop Fire–DE. The shareholders then reconstituted the Board of Directors to include only Joseph J. McGuire, President of Stop Fire–DE, Harold Small, President of M & T, Martin S. Orland, Executive Vice–President of Franklin, and Donald A. Ross, President of Rand. The new board removed all the existing officers except the President, made McGuire both President and Treasurer, and elected Martin S. Orland as Secretary and Vincent Protano as Assistant Secretary.

Franklin continued to infuse fresh capital into Stop Fire–DE, including new financing for materials, legal services, and insurance, as well as accounts receivable financing. Finally, on June 4, 1976, Franklin and M & T created Stop Fire–NJ, to which they assigned the assets of Stop Fire–DE which had been purchased by Franklin and M & T from the bankruptcy estate.

Stearns & Foster contends that the decision to place Stop Fire–DE into bankruptcy, the decision to purchase the assets from the bankruptcy estate, and the decisions regarding the make-up of the Board and Officers of Stop Fire, all demonstrate Franklin's involvement with Stop Fire's business. Indeed, Stearns & Foster contends that the Investor Group made an "indepen-

dent evaluation of the future business opportunities of [Stop Fire]." This assertion, although supported by the record, does not demonstrate "actual control" within the meaning of *Lansford–Coaldale*. This court's concern must be to identify actions which were inconsistent with the investment relationship. *See Lansford–Coaldale*, 4 F.3d at 1222. Even "complete ownership and the concomitant general authority or ability to control that comes with ownership" is insufficient to impose "operator" liability. *Kayser–Roth*, 910 F.2d at 27. Franklin, both as an investor and as a member of the Board of Directors of Stop Fire–DE, acted in a manner which it calculated, incorrectly as it turned out, would maximize the return on its investment. In discussing whether a lender's actions might amount to "participation in management," the Ninth Circuit stated that:

> Creditors do not give their money blindly, particularly the large sums of money needed to build industrial facilities. Lenders normally extend credit only after gathering a great deal of information about the proposed project, and only when they have some degree of confidence that the project will be successful. A secured creditor will always have some input ... and, by the extension of financing, will perforce encourage those projects it feels will be successful. If this were "management," no secured creditor would ever be protected.

*In re Bergsoe Metal Corp.*, 910 F.2d 668, 672 (9th Cir.1990).

However, Franklin undoubtedly became more involved with Stop Fire–NJ than it had been with Stop Fire–DE. Franklin allegedly participated in interviewing and hiring a Comptroller for Stop Fire in mid–1976. *See* Certification of Thomas Johnson, ¶ 3.[12] In March, 1977, McGuire was ousted as President of Stop Fire–NJ, following a dispute about money he was alleged to have personally owed to Stop Fire. McGuire was suc-

---

10. M & T and Rand also received security interests, warrants, and one seat each on the Board of Directors.

11. Stearns & Foster never completely explains how the Investor Group, with only three out of seven votes on the Board of Directors of Stop Fire–DE, could have acted "unilaterally."

12. Martin Orland testified at his deposition that the decision to hire Mr. Johnson was McGuire's alone, although others may have interviewed him. Orland Dep. at 231.

ceeded by Martin S. Orland. Although Orland also retained his position as Executive Vice–President of Franklin, he spent a considerable amount of his time at the Stop Fire facility in South Brunswick. How much time he spent there is difficult to determine from the summary judgment record. Orland continued as both President of Stop Fire–NJ and Executive Vice–President of Franklin until December, 1977, when Michael Gioseffi was hired as President and CEO of Stop Fire–NJ.

Franklin contends that these actions are insufficient to demonstrate "pervasive" control. In short, Franklin contends that its involvement with Stop Fire–NJ, through Orland, was of short duration and, in effect, was necessitated by external events, not motivated by a desire to control Stop Fire–NJ. It is noteworthy, in this regard, that those cases that deny summary judgment to an affiliated company uniformly involve a parent or sibling corporation which is engaged in the same business as the subject company.[13] In *Bancamerica Commercial Corp. v. Trinity Indus.*, 900 F.Supp. 1427 (D.Kan.1995), the companies concerned were all involved in the production of structural steel. In *Vineland Construction v. Universal–Rundle Corp.*, Civ. Action No. 92–3115 (D.N.J. Dec. 30, 1994), the court found the record inadequate to grant summary judgment in favor of Sears, which was an owner, at the relevant time, of a majority interest in Universal–Rundle, a company which, at that time, provided Sears with eighty (80) percent of its cast iron and vitreous china needs. *Id.*, slip op. at 5. In *Lansford–Coaldale,* the allegation was that Tonolli Canada, a company engaged in lead smelting and metal reclamation, was an "operator" of its sister corporation, Tonolli PA, another lead smelting operation. *Id.*, 4 F.3d at 12–08–09. The related companies in *John S. Boyd Co. v. Boston Gas Co.*, 992 F.2d 401 (1st Cir.1993), were utilities. In *Kayser–Roth*, the parent company, Kayser–Roth, had been in the textile manufacturing business for several years prior to its acquisition of the Stamina Mills subsid-

iary, the subject of the CERCLA action. Kayser–Roth had substantial knowledge concerning the textile business, and placed its own personnel in positions as directors and officers of Stamina Mills in order to effectuate its policies. *See United States v. Kayser–Roth Corp.*, 724 F.Supp. 15, 17–19 (D.R.I. 1989).

When considering evidence offered in support of "actual control" of a subsidiary company, the Eleventh Circuit has noted that:

> It is particularly important that the record contain such evidence in a case ... where the parent company ... is in an entirely different business than that of the subsidiary. Certain isolated bits of evidence in th[e] record may have greater meaning if attributed to a parent engaged in a similar endeavor such that a greater level of direct involvement and control by the parent could be presumed.

*Jacksonville Elec. Auth. v. Bernuth Corp.*, 996 F.2d 1107, 1111 (11th Cir.1993). The importance of this observation lies in its recognition that the "actual control" test, rather than being some talismanic formula, is a framework for uncovering the kind of pervasive control by a related company that so blurs the distinctions created by the corporate form that the parent or sibling no longer deserves to be insulated from the environmental liability of its related company. This court's decision regarding the "operator" liability of Franklin must be made against this background. Clearly, at least in some circumstances, the act of placing an officer of one corporation in a position as an officer of a related corporation may be less an exercise of "pervasive control" than a mere reaction to events as they have unfolded.

The facts of *Jacksonville Electric* are instructive. There, the district court found that there was insufficient evidence to demonstrate that Tufts University, an institution of higher education, was an "operator" of Eppinger & Russell Co., a creosoting plant of which Tufts was the majority shareholder. The court made this finding, which was up-

---

**13.** In the only arguable exception, *FMC Corp. v. U.S. Dept. of Commerce*, 29 F.3d 833 the liable "parent" was the United States, which, pursuant to actions taken by the War Production Board, both commissioned and consumed the high tenacity rayon produced at the "facility" in question for use in the manufacture of tires. *Id.*, 29 F.3d at 835.

held on appeal, despite allegations that Tufts and Eppinger had common directors and officers, that Tufts received regular financial status reports on Eppinger and that Tufts hired an engineer to do a survey and report, who later became a director of Eppinger, as well as its Vice–President and General Manager. *Jacksonville Elec. Auth. v. Eppinger and Russell Co.*, 776 F.Supp. 1542, 1548–49 (M.D.Fla.1991).

■ This case presents a closer question, but only because Martin Orland acted as President of Stop Fire–NJ for approximately seven months in 1977. Were it not for this period of employment as an officer of Stop Fire–NJ, during which Orland remained employed as Executive Vice–President of Franklin, this case would closely parallel *Jacksonville Electric.* The court in *Jacksonville Electric* concluded that the Trustees of Tufts University held Eppinger for its investment value, not because they were interested in operating a creosoting plant. Likewise, a Small Business Investment Corporation, like Franklin, presumably makes investments in a given manufacturing enterprise because it seeks a return on its investment, not because it hopes to operate a fire extinguisher manufacturer. I conclude that, contrary to the assertions of Stearns & Foster, the mere fact that Orland assumed the interim presidency of Stop Fire does not automatically imply that Franklin exercised "actual control" of Stop Fire. In order to show "actual control" by Orland, and thus, by Franklin, Stearns & Foster must demonstrate Orland's pervasive involvement in decision-making during his tenure at Stop Fire.

In support of its motion for summary judgment Stearns & Foster points to the fact that a Stop Fire plant foreman, George Balint, testified that he reported to Orland while Orland functioned as president of the company. Balint Dep. at 60. Yet Balint also testified that Orland "had nothing to do with ... the manufacturing part of it." *Id.* Balint identified Orland as "the money man." *Id.* at 61.

On June 28, 1977, Orland reported to Franklin's Board of Directors that he "was spending most of his time working at Stop Fire and that new controls had been implemented and efforts were continuing towards restoring the company to a profitable basis." Minutes of the Annual Meeting, attached as exhibit 65 to Bruno Certif. Several other corporate memoranda confirm that Orland spent considerable time at Stop Fire. In one document relied upon by Stearns & Foster, which appears to be a memo to the file from George Rand, President of Rand Corporation, Orland is described as having "found that Stop Fire's inventory is badly out of balance" and reported to be "laying off 10 people" and as "firing Paul Nurkiewicz," and Orland is said to be spending "five to six days per week" at Stop Fire. Bruno Certif., ex. 60. In contrast, Orland testified with regard to this document that:

> ... if a discovery [regarding the inventory] was made it would have been brought to my attention.

> Q. And who would have made that discovery?

> A. Whoever was running the plant.

> . . . .

> Q. The next statement says that you are spending full-time with the company working five to six days a week. Is that accurate?

> A. No.

> Q. What is the more accurate statement?

> A. One to three.

> Q. One to three? And this is the point in time when you took on the position of president of Stop Fire of New Jersey?

> A. That's correct.

Orland Dep. at 246–47.[14] Stearns & Foster points to a statement contained in this memorandum to the effect that "Orland will probably continue to run [Stop Fire–NJ] until the end of the year anyway." Bruno Certif., ex. 60. In deposition testimony, Orland disputes that he ever "ran" the company. Orland Dep. at 252. Orland describes his role at

14. Balint testified that Orland was at the Stop Fire plant "sometimes three or four days" during this period. Balint Dep. at 140.

Stop Fire as that of a "comptroller" and denies having had any oversight responsibilities for the day-to-day management of the plant. *Id.* at 258. In short, all of the statements made in the memorandum to the effect that Orland controlled Stop Fire–NJ are contradicted by Orland's own deposition testimony.

■ The question whether Franklin "actually controlled" the operation of Stop Fire–NJ is inextricably intertwined with the question of the extent of Orland's involvement in day-to-day operational decision-making while he acted as president of Stop Fire–NJ. This determination cannot be made on the summary record as it now exists. Stearns & Foster has mustered documentary evidence suggesting that Orland was deeply involved in the operation of Stop Fire–NJ. However, Orland's deposition testimony, and the deposition testimony of others, including some employees of Stop Fire–NJ, does not support this view. Because the extent of Orland's involvement in the operations of Stop Fire–NJ is material, indeed, crucial to this court's disposition of the question of "operator" liability under CERCLA, and because the summary judgment record reflects the existence of a genuine dispute as to this question, summary judgment must be denied, both as to Franklin and Stearns & Foster on this issue.

### (4) M & T's Operator Liability

M & T contends that its conduct vis-à-vis Stop Fire–DE was within the normal confines of the debtor-creditor relationship. M & T likens its relationship with the Stop Fire entities to the "routine involvement in the financial affairs of [a] debtor[ ]" which a secured lender must undertake "in order to insure that [its] interests are being adequately protected." *Z & Z Leasing, Inc. v. Graying Reel, Inc.*, 873 F.Supp. 51, 55 (E.D.Mich. 1995). In the interest of protecting those who make capital available, "[a] secured creditor must be permitted to monitor any

aspect of a debtor's business relating to the protection of its security interest without incurring liability." *Id.* As noted, if a secured lender, such as M & T held "indicia of ownership" in the Stop Fire entities "primarily to protect [its] interest in the . . . facility," it is exempted from "operator" status. 42 U.S.C. § 9601(20)(A).

■ On January 13, 1976, while Stop Fire–DE was in bankruptcy, M & T, along with Franklin, exercised certain stock warrants making them shareholders of Stop Fire–DE.[15] M & T and Franklin continued as shareholders of Stop–Fire–NJ. Rand later became a preferred shareholder of Stop Fire–NJ by converting its security interest in inventory and equipment, in early 1977. However, the mere fact that a secured lender takes an equity position in its debtor does not necessarily place the lender beyond the pale of § 9601(20)(A)'s exemption. *See United States v. Wallace*, 893 F.Supp. 627, 634 (N.D.Tex.1995).

■ It can be argued that a decision to convert debt to equity in order to dress up the balance sheet in an effort to make a company more attractive to lenders and potential buyers signals an abandonment of an effort to protect a security interest. The lender's role then arguably becomes that of an investor. *See* Lender Liability Under CERCLA, EPA, Final Rule, 57 Fed.Reg. 18344, 18375 (1992) ("In contrast, under section 101(20)(A), 'indicia of ownership' held 'primarily to protect (a) [sic] security interest' do not include evidence of interests in the nature of an investment in the facility, or an ownership interest held primarily for any reason other than as protection for a security interest."). It is clear, however, that the fact that a lender has acted primarily for some other reason than to protect its security interest merely means that such a lender cannot avail itself of the exemption contained in § 9601(20)(A), it does not mean that such a

---

**15.** Stearns & Foster points out that, at a July 7, 1976, meeting of the Board of Directors of Rand, Rand's Treasurer reported, with regard to Stop Fire, that "the two principal creditors of the company [Franklin and M & T] have taken over its operation." Bruno Certif., ex. 94. This state- ment presumably refers to the stock transaction which made Franklin and M & T sole owners of Stop Fire. In any event, a single isolated characterization by Rand's Treasurer cannot establish "operator" status.

lender is automatically an "operator" of the facility in question.

M & T shared no officers with any of the Stop Fire entities. M & T never held more than a minority position in the stock of Stop Fire and never dominated its Board of Directors. True, M & T was keenly interested in the performance of the Stop Fire entities. This is not unusual. Indeed, it would have been unusual had M & T taken no interest in the companies in which it had invested.

Orland's assumption of the interim presidency of Stop Fire–NJ creates a close question concerning Franklin's potential control of Stop Fire–NJ during this period. There is simply no such question presented as to M & T's much more limited involvement with Stop Fire–NJ. George Balint, a foreman at Stop Fire, when asked at his deposition if he could identify Harold Small, M & T's representative on the Stop Fire Board of Directors, said:

A. I know the name, but I can't remember what he did or what he was associated with. Maybe he was part of one of the companies that invested. I really don't know, honestly. But I met him.

Q. Where?

A. At the plant, in the office.

Q. When?

A. I don't know when, but I do know I met him.

Balint Dep. at 184–85. Frank Cwik, another foreman, was even more vague. At his deposition, after stating that he remembered hearing the name of Harold Small, he was asked:

Q. To your recollection, did you ever meet Harold Small?

A. No.

Q. Do you know whether he was ever at the plant?

A. No, I don't know.

Q. At least—

A. (Interposing) He could have been, but I never met him.

Q. To your knowledge, did he have anything to do with any part of the operations at the plant?

A. Not that I know of; no.

Cwik Dep. at 125. Furthermore, when Cwik was asked if he had ever heard of M & T Capital Corporation, he answered "No." *Id.* at 128.

 Because the evidence in the summary judgment record does not support Stearns & Foster's assertion that M & T "actually operated" either Stop Fire–DE or Stop Fire–NJ, summary judgment will be granted in favor of M & T on the issue of "operator" liability under CERCLA.

### (5) Rand's Operator Liability

Because I have concluded that M & T, whose involvement with Stop Fire–NJ was greater than any involvement on the part of Rand, was not an "operator" under CERCLA, I must similarly conclude that no CERCLA "operator" liability attaches to Rand.

In its moving papers, Stearns & Foster paints with a broad brush, clearly hoping to taint Rand and M· & T along with Franklin. *See* Plaintiff's Brief in Support of Summary Judgment at 56–68. However, plaintiff adduces very few facts which, when viewed in the light most favorable to Stearns & Foster indicate that Rand had even the most minute involvement in the day-to-day operations of the Stop Fire entities.

Stearns & Foster seemingly senses the weakness of its assertion of "operator" status regarding Rand. In response to Rand's contention that the vast majority of its "contacts" with the Stop Fire companies consisted of attendance at periodic meetings of the Board of Directors, Stearns & Foster asserts that Rand "fails to account for its extensive involvement with Stop Fire through the actions of Franklin, which it ... designated as its agent." Plaintiff's Brief in Opposition to Summary Judgment at 7. Presently, this court will turn its attention to Stearns & Foster's "agency" theory of "operator" liability. For the purposes·of Rand's direct "operator" liability, however, Stearns & Foster has failed to show that Rand participated in the day-to-day management of Stop Fire to a degree which amounts to "actual control." "It is clear ... that, whatever the precise parameters of 'participation,' there must be *some* actual management of the facility be-

fore a secured creditor will fall outside the exemption." *In re Bergsoe,* 910 F.2d at 672.

### (6) Agency Liability of M & T and Rand

As noted above, Stearns & Foster contends that, whatever the degree of direct control exercised over the Stop Fire entities by M & T and Rand, both companies are liable as "operators" because Franklin acted as their agent. Indeed, Stearns & Foster has marshalled so little evidence of direct control by M & T or Rand, that a finding of "operator" liability under CERCLA against either company must be based upon this theory. However, even if Franklin were an "operator" within the meaning of CERCLA, Stearns & Foster's "agency" argument is without merit.

■■■ "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1 (1957). Stearns & Foster bases its "agency" theory on the express authority contained in an agreement dated November 21, 1973 (the "Agreement"), between Stop Fire–DE, on the one hand, and Franklin, M & T and Rand, on the other, by which the Investor Group bought certain Stop Fire promissory notes, and which inaugurated the relationship between the Investor Group and Stop Fire–DE.[16] This agreement appointed Franklin as Agent "on behalf of any and all holders of the Notes from time to time outstanding, to the extent herein provided or implied." Bruno Certif., exhibit 6, at 52. Stearns & Foster asserts that this document constituted a broad delegation of authority to Franklin to act on behalf of M & T and Rand. This is simply not supported by the language of the Agreement. The Agreement sets forth specific areas in which Franklin is authorized to act for M & T and Rand, and then only with the approval of "the holders of at least 58% in principal amount of the notes at the time outstanding." *Id.* at 52–53.

Moreover, the Agreement related only to Stop Fire–DE, which was dissolved in bankruptcy in 1976. Stearns & Foster has completely failed to show that the Investor Group, or any of them, "actually controlled" Stop Fire–DE. At no time were officers or employees of the Investor Group present in a managerial capacity at the Site, during the time when it was operated by Stop Fire–DE. As noted above, the only colorable claim to Franklin's exerting "actual control" over the Stop Fire operation exists during the time period when Orland acted as the interim president of Stop Fire–NJ. Stearns & Foster does not point to any further agreement which provided for Franklin's agency during this period, or which, by implication, could have extended the agency provision set forth in the Agreement to cover this period.

The arrangement between the individual corporations in the Investor Group to appoint Franklin as Agent, an arrangement of convenience, simply cannot be stretched into a broad and ongoing delegation of power sufficient to impose "operator" liability on M & T or Rand. Furthermore, such a holding would run counter to the spirit of *Lansford–Coaldale,* in which the Third Circuit stated that the "longstanding rule of limited liability remains the background norm." *Id.,* 4 F.3d at 1221. It would be ironic to impose operator liability on a corporation which has not demonstrated pervasive control of a subsidiary, and which, indeed, may claim the benefit of the lender liability exclusion of § 9601(20)(A), solely because that corporation authorized another to act for it in order to simplify the debtor-creditor relationship.

Because Stearns & Foster has failed to show that M & T and Rand were principals, and Franklin their agent, during the time that Orland acted as the interim president of Stop Fire–NJ, Stearns & Foster's attempt to hold M & T and Rand liable as "operators" on an agency theory must fail.

### C) The Continuity of Enterprise Theory

Plaintiff, Stearns & Foster, seeks a declaration that Stop Fire–NJ is responsible for any CERCLA liability which attaches to its

---

**16.** Stearns & Foster also points to a 1975 agreement extending further financing to Stop Fire– DE, which contained a similar agency provision.

predecessor companies, Stop Fire–NY and Stop Fire–DE. Stearns & Foster urges this court to adopt the "continuity of enterprise" theory, which it calls a "more flexible" standard for the imposition of CERCLA liability on a corporate successor. Plaintiff's Brief at 14.

It is now undisputed that, in certain circumstances, a successor corporation may be held liable under CERCLA as a "person," within the meaning of 42 U.S.C. § 9607, for the acts and omissions of its predecessor corporations. In discussing CERCLA's preference for funding cleanups at the expense of responsible parties, the Third Circuit has observed that:

> Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor corporation should bear the cost. Benefits from the use of pollutants as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.

*Smith Land & Improvement Corp. v. Celotex,* 851 F.2d 86, 92 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). Although the Third Circuit has determined that successor liability applies in the CERCLA context, it has not had occasion to define the precise contours of such liability. Thus, the viability of the "continuity of enterprise" theory is unsettled in this circuit. This court, however, need not decide whether such a theory is viable, of course, unless it is necessary in order to dispose of one or more of the issues pending before the court.

Notably, Stearns & Foster nowhere suggests that any of the investors is itself a successor corporation to any of the Stop Fire entities. Moreover, Stearns & Foster does not argue that liability attaches to any member of the Investor Group because of its ownership interest in Stop Fire–NJ. Rather, Stearns & Foster apparently seeks to impose successor liability on Stop Fire–NJ because it believes that, in this manner, the liability of the prior Stop Fire entities will redound upon the Investor Group, insofar as any of them are found to be operators of Stop Fire–NJ. Indeed, although Stearns & Foster has named each Stop Fire corporation as a defendant, its present motion for summary judgment is directed only at Franklin, M & T and Rand. *See* Stearns & Foster's Notice of Motion filed June 12, 1996.

The cases cited by Stearns & Foster in support of its contention that Stop Fire–NJ should bear the liability of Stop Fire–NY and Stop Fire–DE all address the liability of a successor corporation for the acts of a predecessor. None even touches upon the liability of a third company for the acts of the successor's predecessor. Put another way, the declaration that Stearns & Foster seeks, that Stop Fire–NJ is liable as a successor to the earlier Stop Fire entities, is meaningless, at least for purposes of this motion, unless CERCLA liability attaches to one or more of the members of the Investor Group. This piece of the puzzle is missing from Stearns & Foster's argument, and it is crucial.

In sum, Stearns & Foster has articulated no legal theory upon which any member of the Investor Group could be held liable for the acts of Stop Fire–NY and Stop Fire–DE. Stearns & Foster has not moved for summary judgment against Stop Fire–NJ. For these reasons, it is unnecessary to address the issue of the possible successor liability of Stop Fire–NJ in order to resolve the instant motions. Accordingly, this court will deny Stearns & Foster's request for a declaration that successor liability attaches to Stop Fire–NJ for the environmental contamination allegedly caused by Stop Fire–NY and Stop Fire–DE.

### D) The New Jersey Spill Act

The New Jersey Spill Act is the state's analog to CERCLA. *SC Holdings,* 935 F.Supp. at 1365; *Fishbein Family Partnership v. PPG Indus.,* 871 F.Supp. 764, 772 (D.N.J.1994). Unsurprisingly, the law under the Spill Act has developed along parallel lines to that of CERCLA. *New Jersey DEPE v. Gloucester Environmental Management Svcs.,* 821 F.Supp. 999, 1009 (D.N.J. 1993).

 Plaintiff may only maintain its contribution action under the Spill Act if it can show that each defendant is a "person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance." N.J.Stat.Ann. § 58:10–23.11g(c)(1) (West 1992). In order to impose liability on a parent or sibling corporation under the Spill Act, the plaintiff must "prove the same elements ... as under CERCLA." *Fishbein Family Partnership,* 871 F.Supp. at 772. Accordingly, for the reasons previously set forth,[17] Stearns & Foster's claims for violations of the Spill Act will be dismissed as against M & T and Rand. Summary judgment on this claim will be denied to Franklin and as to Stearns & Foster until Franklin's "operator" liability under CERCLA, *vel non,* has been finally determined.

### E) Martin S. Orland's Motion for Summary Judgment

Orland seeks to dismiss the claims against him on the basis that he cannot be shown to have been an "operator" of either Stop Fire–DE or Stop Fire–NJ. Stearns & Foster does not allege that Orland was an "owner" of either of the Stop Fire entities. Absent some justification for "piercing the corporate veil," no "owner" liability could attach to the officers of Franklin, and Stearns & Foster has presented no argument in favor of "piercing the corporate veil." Rather, Stearns & Foster alleges that Orland, like the other defendants, was an "operator" of the Stop Fire entities when the contamination occurred.

 The cases discussing when a corporate officer can be held liable as an "operator" under CERCLA were ably digested by Judge Debevoise in *Analytical Measurements v. Keuffel & Esser Co.,* and need not be reexamined here. *See id.,* 816 F.Supp 291, 296–98 (D.N.J.1993). It is sufficient to note that I agree with Judge Debevoise that these cases stand for the proposition that an individual defendant can only be held liable as an "operator" when the evidence demonstrates that the individual "personally participated" in the relevant *environmental* decision-making. *Id.*

Stearns & Foster substantially agrees with this reading of the relevant law. Indeed, Stearns & Foster concedes that it has uncovered no evidence that Orland "personally participated in the disposal of hazardous substances at the Site." Plaintiff's Brief in Opposition at 36. Appropriately, therefore, Stearns & Foster does not oppose Orland's motion for summary judgment as to CERCLA liability, Counts One and Two of the Third Amended Complaint.

Stearns & Foster contends that Orland is nevertheless liable under New Jersey's Spill Act, and on its common law claims. *See* Plaintiff's Brief in Opposition, Points IV and V. As to the Spill Act, however, Stearns & Foster cites no case which supports individual officer liability, absent circumstances that warrant "piercing the corporate veil." In *Analytical Measurements,* the court held, to the contrary, that, under the Spill Act, a corporate officer "could only be held liable if the corporate veil was pierced." *Id.* at 299. As noted, plaintiff has not contended that the "corporate veil" between the Stop Fire entities and Franklin should be "pierced," much less that Franklin's own "corporate veil" must be "pierced" in order to reach Orland. Notably, the Spill Act claims were dismissed against the individual officer in *Analytical Measurements,* despite the fact that the same individual was denied summary judgment on the CERCLA liability issues. *Id.* at 298. In this case, Orland presents an even more compelling argument in support of summary judgment on the Spill Act claims, insofar as Stearns & Foster has abandoned its CERCLA claims against him.

 As to Stearns & Foster's common law claims, Orland cannot be liable as a vendor of the Site, because, unless the "corporate veil" is "pierced," "the property of a corporation is its property" and not that of its officers or shareholders. *Id.* at 296.

Stearns & Foster's claims based upon strict liability and negligence also fail as Orland owed no duty to Stearns & Foster. The single case plaintiff cites in support of its negligence claim is unavailing. In *Rus-*

17. *See supra* parts III.b.4 and III.b.5.

sell–Stanley Corp. v. Plant Indus., 250 N.J.Super. 478, 595 A.2d 534 (Ch.Div.1991), the court denied summary judgment to a landlord because the record revealed that "a factual issue exist[ed] as to the level and nature of [the landlord]'s control" over the facility in question at the time the pollution occurred. Id. at 507. In short, Russell–Stanley stands for the proposition that a landlord who is directly responsible for contamination may be liable in negligence to a subsequent lessee. There is no similar situation with regard to Orland. Stearns & Foster simply has not advanced any theory under which Orland could be held directly responsible for the contamination of the Site. Accordingly, the plaintiff's negligence claim, as against Orland, must be dismissed.

 It is also generally recognized that a party will not be liable for common law contribution or indemnification unless it is primarily liable for some independent wrong. A cause of action for contribution arises "when two or more persons become liable in tort to the same person for the same harm." Restatement (Second) of Torts § 886A(1) (1977). Likewise, indemnity only comes into play "[i]f two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both." Restatement (Second) of Torts § 886B(1) (1977).

 Finally, Stearns & Foster has alleged unjust enrichment, or restitution against Orland. See Plaintiff's Third Amended Complaint, Count Six. To succeed on an action for unjust enrichment, a plaintiff must establish that a defendant received a benefit, and that the defendant's retention of that benefit would be unjust. VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (1994). Orland was at all times an employee of Franklin. Brief in Support of Defendant, Martin S. Orland's Motion for Summary Judgment at 4. At no time was Orland a shareholder of Franklin or any of the other corporate defendants. Id. Accordingly, Orland has not been unjustly enriched, even if Franklin has been. Plaintiff offers no theory, much less any case law, to the contrary.

Having no viable claim against Orland for liability based upon his own actions, Stearns & Foster can prove no claim for contribution or indemnification. Similarly, Stearns & Foster's claim for unjust enrichment must be dismissed. The motion for summary judgment on Counts One through Eight of plaintiff's Third Amended Complaint, filed by Martin S. Orland will be granted in its entirety, and Mr. Orland will be dismissed as a defendant in this case.

### F) NYCON's Motion for Summary Judgment

Defendant, NYCON, has moved for summary judgment, contending that Stearns & Foster will be unable to demonstrate that NYCON was an "operator" of the Site under the "actual control" standard set forth in Lansford–Coaldale. Because it was never responsible for the release of any hazardous materials at the Site, NYCON asserts that it cannot be liable under the New Jersey Spill Act or under any of the other statutory or common law causes of action adumbrated by Stearns & Foster in its complaint. Similarly, NYCON contends that it cannot be liable for indemnification or contribution because of the absence of any liability for environmental contamination.[18] NYCON's motion is unopposed.

When one party points out to the court that the non-moving party cannot sustain its burden at trial, and the non-moving party fails to produce concrete evidence that there exists any genuine issue of material fact concerning the liability of the moving party, the court must enter summary judgment for the moving party. Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. Accordingly, NYCON's motion for summary judgment will be granted

---

18. For substantially the same reasons, Stearns & Foster's common law claims against M & T and Rand must also be dismissed. Stearns & Foster does not seek to pierce the corporate veil of either Stop Fire–DE or Stop Fire–NJ, nor does Stearns & Foster present any evidence which would support piercing the corporate veil. Because there is no evidence in the summary judgment record that any employee of Rand or M & T was ever involved in actual hazardous waste disposal at the Site, there is no basis for any common-law liability. Accordingly, M & T and Rand will be granted summary judgment on plaintiff's common law claims.

---

and all claims and cross-claims against NY-CON will be dismissed.

## G) The Nurkiewicz Defendants' Motion to Approve Settlement

Defendants, Estate of Macy Nurkiewicz, Estate of Ignatius Nurkiewicz, and I.M.P. Co., have moved for approval of their settlement with Stearns & Foster and to dismiss the cross-claims against them. Plaintiff joins the Nurkiewiczes' motion. Defendants, Franklin, M & T and Rand, oppose the approval of this settlement.

In deciding whether to approve a proposed settlement in a CERCLA case, a district court must weigh the "fairness, adequacy and reasonableness" of the proposed settlement. *United States v. Rohm & Haas Co.*, 721 F.Supp. 666, 685 (D.N.J.1989). Stearns & Foster contends that the proposed settlement, a payment of approximately $200,000.00 and an assignment of certain insurance policies, is not fair, adequate or reasonable in view of the long association of the Nurkiewicz defendants with the Site.

Franklin points out that the Nurkiewicz defendants were shareholders in the Ashwill Corp., the owner of the property from 1953 to 1970. Franklin's Response Brief at 36. Macy Nurkiewicz was Plant Manager of Stop Fire for almost twenty years, during which time Stop Fire allegedly discharged hazardous substances. Franklin's Response Brief at 37. Moreover, the Nurkiewicz defendants were general partners in I.M.P. Co., which owned the property from 1970, until its sale to Stearns & Foster in 1979. *Id.* Based upon this long association with the Site and with the various Stop Fire entities, Stearns & Foster contends that a $200,000.00 settlement in this multi-million dollar lawsuit is not fair, adequate or reasonable. I disagree.

The Nurkiewicz defendants assert that the settlement amount, approximately $200,-000.00, represents their entire assets. *See* Decl. of Jeffrey W. Gerber, Esq.; Decl. of Frederick R. MacLean. Based upon the record, there is no reason to doubt this assertion. "Compromise of litigation occurs precisely because there is uncertainty about the range of possible recoveries. If a settlement is reasonable in light of those circumstances, it ought to be approved." *Rohm & Haas,* 721 F.Supp. at 686. In this case, it appears virtually certain that Stearns & Foster could not do better than the amount which has been offered as part of this settlement.

I suspect that the highest hurdle in the path of this settlement has not been the adequacy of the settlement amount, but rather the Nurkiewiczes' demand that the cross-claims be dismissed with prejudice as part of the settlement. Indeed, the parties are aware that the potential liability of the Nurkiewicz defendants far exceeds the amount they have offered in settlement. The remaining dilemma is who will bear the risk that Stearns & Foster has settled for less than the total liability of the Nurkiewicz defendants. Naturally, Stearns & Foster contends that the non-settling defendants are entitled to no more than a *pro-tanto* reduction for the settlement amount. The Investor Group argues for a *pro-rata* deduction, which implicitly requires a determination at trial of the Nurkiewicz defendants' allocable percentage of the fault. *Compare City and County of Denver v. Adolph Coors Co.,* 829 F.Supp. 340 (D.Colo.1993), *with United States v. Western Processing Co.,* 756 F.Supp. 1424 (W.D.Wash.1990).

In light of this court's conclusion that Stearns & Foster is limited to a contribution action under Section 113 of CERCLA, liability is several, and plaintiff must bear the risk of settlement with any defendant for less than that defendant's several liability. *See American Cyanamid Co. v. King Indus., Inc.,* 814 F.Supp. 215 (D.R.I.1993) (applying principles of the Uniform Comparative Fault Act to CERCLA contribution action). Plaintiff, by joining the Nurkiewicz defendants' motion to approve the settlement, accepts this risk. In addition, a settling defendant in a private party CERCLA action cannot be sued for contribution by any non-settling defendant. *See Barton Solvents, Inc. v. Southwest Petro–Chem, Inc.,* 834 F.Supp. 342, 346 (D.Kan.1993); *American Cyanamid,* 814 F.Supp. at 219. Accordingly, the court will approve the settlement and dismiss the cross-claims against the Nurkiewicz defendants with prejudice.

## H) The Motions to Strike

Finally, defendants have moved to strike the certifications of José Morera, Carmelo Figueroa and Oscar Franz, and the affidavits of George Gilkie and Peter Edmonds, filed in support of Stearns & Foster's motion for summary judgment and in opposition to defendants' motions.[19] These affidavits and certifications all relate to alleged discharges of hazardous substances during the years that the Investor Group was associated with the Stop Fire entities. As noted, Stearns & Foster cannot establish the "operator" liability of any defendant unless it can show that the defendant in question operated the Site "at the time of disposal." 42 U.S.C. § 9607(a)(2). The Investor Group contends that, without these certifications, the summary judgment record is devoid of any evidence that a discharge of hazardous substances occurred at the Site after they became involved with Stop Fire, Inc., in 1973.

Because I have determined that Franklin is the only potential "operator" among the Investor Group, and then, at most, for the period in which Orland acted as interim president of Stop Fire–NJ, from March to December, 1977, it is completely unnecessary to consider any affidavits or certifications which do not address hazardous waste discharges during this period of time.[20]

José Morera, who was employed by Stop Fire from 1971 through its closing in July, 1978, states that he personally drained liquids from the degreasing machine, through a hose, onto the ground outside the paint department. Morera Certif. ¶ 4. It must be assumed for the purposes of summary judgment that the liquids in question contained hazardous substances.

George Gilkie, who was employed at Stop Fire from May 1, 1976 through July 31, 1978, states that, although he was not personally aware of any dumping of solvents at the Site, he remembered seeing "stains on the ground outside the paint room," which signified to him that something had been dumped there. Gilkie Affidavit ¶ 6.

The Federal Rules of Civil Procedure provide that any "party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1). Thus, Rule 37(c)(1) provides a legitimate basis for striking an affidavit or certification in appropriate circumstances. Whether or not to strike the affidavits, in this instance, as a sanction for failure to disclose or obey the orders of the court, falls squarely within this court's discretion. Guiding that discretion, as with any discretionary sanction, are the principles announced by the Third Circuit in *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 867 (3d Cir.1984). In *Poulis*, the Third Circuit identified six factors[21] a dis-

---

19. Defendants, M & T and Rand, have filed notices of motion seeking to strike these certifications and affidavits. Rand also seeks to strike the affidavit of Steven Morabito. Because I have concluded that M & T and Rand are not "operators" under CERCLA, these motions will be dismissed as moot. Although no formal motion papers were filed, the court will treat Franklin's request in its reply brief as a motion to strike, in accordance with the express request of Franklin's counsel set forth in a letter to the court dated June 17, 1996.

20. Carmelo Figueroa was no longer employed by Stop Fire at the relevant time and his certification has not been considered by the court in deciding these motions. The certification of Georges Chmielinski states only that he began his employment with Stop Fire in "the 1960's" and "worked for a period of approximately eight years." Chmielinski Certif. ¶ 1. In view of the uncertainty of the time of employment, the court has not considered the Chmielinski Certification in deciding these motions.

The certification of Oscar Franz and the affidavit of Peter R. Edmonds, Ph.D., are irrelevant to the issue of actual hazardous waste disposal and have not been considered by the court. The affidavit of Steven Morabito, attached as exhibit 85 to the Bruno Certif., states that Morabito witnessed, but did not participate in, dumping of "55–gallon drums" and some "solid/sludge" materials. However, at his deposition, Morabito was unable to amplify upon his affidavit or to identify any hazardous waste disposal which occurred during the relevant time period. Accordingly, the court has not considered Mr. Morabito's affidavit in deciding these motions.

21. These are: (1) the extent of the party's personal responsibility, (2) prejudice to the adversary, (3) a history of dilatoriness, (4) whether the attorney's conduct was willful or in bad faith, (5) the

trict court must consider before imposing sanctions, which, when taken together, create "a strong presumption against sanctions that decide the issues of a case." *Ali v. Sims,* 788 F.2d 954, 958 (3d Cir.1986). Clearly, striking the affidavits and certifications in question would have the effect of deciding the issue of "operator" liability in this case, because it would leave Stearns & Foster without evidence to support an essential element of its claim, *i.e.,* that discharge of hazardous substances took place during the time that the Investor Group allegedly controlled Stop Fire–NJ.

Franklin points out that principal factual discovery in this case was to have been completed by December 29, 1995, pursuant to a Scheduling Order entered by Magistrate Judge Ronald J. Hedges on November 30, 1995. The Gilkie Affidavit was signed on April 9, 1996, and the Morera Certification, on May 1, 1996. Stearns & Foster contends that the delay in locating these former Stop Fire employees was caused, at least in part, by the defendants' opposition to Stearns & Foster's application to examine the pension fund records of the union which represented these employees. According to Stearns & Foster, it only received a list of addresses of former Stop Fire employees on December 9, 1995, pursuant to an order entered by the United States District Court for the District of Columbia on October 24, 1995. If this is so, and Franklin has presented no evidence to contradict Stearns & Foster's assertion, plaintiff has presented by these affidavits and certifications, "newly discovered evidence extracted from a previously missing source." *Useden v. Acker,* 947 F.2d 1563, 1572 (11th Cir.1991) (holding that affidavit was properly stricken when the affiant was available to the party in question throughout the course of discovery, but specifically distinguishing instances of newly discovered evidence), *cert. denied,* 508 U.S. 959, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993).

Franklin further contends that Stearns & Foster will be unable to produce these "elderly" witnesses for trial, and that the affida-

vit and certification, therefore, do not meet the requirement of Fed.R.Civ.P. 56(e). In support of this proposition Franklin cites *Chappell v. Bradley,* 834 F.Supp. 1030, 1033 (N.D.Ill.1993), in which the court opined that affidavit testimony would be inadmissible "[i]f the plaintiffs have no intention of offering the evidence at trial." *Id.* at 1033. *Chappell* is unavailing to Franklin, because the plaintiffs in *Chappell* admitted that they did not intend to use the testimony of the witnesses in question at trial. *Id.* Here, however, there is no evidence that Stearns & Foster does not *intend* to offer the testimony of Gilkie and Morera at trial. Franklin cannot extend *Chappell* to cover all situations in which a party may have difficulty securing an affiant to testify at trial.

Notably, although defendant, Franklin, certainly contests the substance of Morera's certification, it had prepared from the outset of this litigation to defend against precisely such claims. Therefore, Franklin can only claim that it was "surprised" in that it did not know until after discovery was closed that Stearns & Foster had located Morera and Gilkie and intended to use them as witnesses.

■■■ In view of the seriousness of the sanction proposed by Franklin, the absence of evidence of dilatoriness on the plaintiff's part, and the absence of evidence of willfulness or bad faith, this court will deny Franklin's motion to strike the affidavit of George Gilkie and the certification of José Morera.

## IV. Conclusion

For the reasons set forth above, the motion of Stearns & Foster for partial summary judgment will be denied. Similarly, Franklin's motion for summary judgment will be denied. The remaining summary judgment motions of defendants, M & T, Rand, Martin S. Oland, and NYCON, will be granted. The Nurkiewicz defendants' motion to approve the settlement and to dismiss the cross-claims with prejudice will be granted. The motions to strike filed by M & T and Rand will be dismissed as moot. Franklin's motion

availability of alternative sanctions, and (6) the meritoriousness of the claim. *Poulis,* 747 F.2d at

868–70.

to strike will be denied. The court will enter an appropriate order.

ORDER

This matter having come before the Court on the motions of defendants, Franklin Holding Corporation, Franklin Holding Corp.–SBIC, Rand Capital Corp., and NYCON Capital Corp., for summary judgment, Kevin J. Bruno, Esq., of Hannoch Weisman, P.C., appearing on behalf of Plaintiff, Steven Gray, Esq., of Waters, McPherson, McNeill, appearing on behalf of Defendants, Franklin Holding Corp. and Franklin Corporation—SBIC, Daniel M. Darragh, Esq., of Buchanan Ingersoll, and David S. Garber, Esq., appearing on behalf of Defendant, M & T Capital Corp., Alfred C. Constants, III, Esq., of Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, appearing on behalf of Defendant, NYCON Capital Corp., Alice J. Kryzan, Esq., of Kryzan & Kolaga, L.L.P., and Thomas E. Hastings, Esq., of Smith, Stratton & Brennan, appearing on behalf of Defendant, Rand Capital Corporation, James E. Berube, Jr., Esq., appearing on behalf of Defendants, Stop–Fire Inc. and Joseph J. McGuire, Richard C. Memhard, appearing *pro se*, Jeffrey Gerber, Esq., of Bressler, Amery & Ross, P.C., appearing on behalf of Defendants, Estate of Macy Nurkiewicz, Estate of Ignatius Nurkiewicz, and I.M.P. Co., Lawrence S. Lawrence, Esq., of Lawrence & Walsh, and Russell M. Woods, Esq., of Woods and Trembulak, appearing on behalf of Defendant, Martin S. Orland; and,

The Court having considered the complaint, the briefs filed in support of and in opposition to these motions, as well as the relevant affidavits, certifications and exhibits on file, for the reasons set forth in this Court's OPINION, filed concurrently with this ORDER,

It is on this 3rd day of December, 1996, ORDERED that:

1. the motion of defendants, Franklin Holding Corporation and Franklin Holding Corp.–SBIC, for summary judgment is DENIED;

2. the motion of defendant, M & T Capital Corporation, for summary judgment is GRANTED in its entirety;

3. the motion of defendant, Rand Capital Corporation, for summary judgment is GRANTED in its entirety;

4. the motion of defendant, Martin S. Orland, for summary judgment is GRANTED in its entirety;

5. the motion of defendant, NYCON Capital Corporation, for summary judgment is GRANTED in its entirety;

6. the motion of plaintiff, Stearns & Foster Bedding Corporation, for partial summary judgment is DENIED;

7. the motion of defendants, Estate of Macy Nurkiewicz, Estate of Ignatius Nurkiewicz, and I.M.P. Co., to approve a settlement and to dismiss all cross-claims is GRANTED, and the cross-claims filed against the Estate of Macy Nurkiewicz, Estate of Ignatius Nurkiewicz, and I.M.P. Co., are DISMISSED WITH PREJUDICE;

8. the motion of defendant, Rand Capital Corporation, to strike certain affidavits and certifications filed in support of Stearns & Foster's motion for summary judgment is DISMISSED AS MOOT;

9. the motion of defendant, M & T Capital Corporation, to strike certain affidavits and certifications filed in support of Stearns & Foster's motion for summary judgment is DISMISSED AS MOOT;

10. the motion of defendants, Franklin Holding Corporation and Franklin Holding Corp.–SBIC, to strike certain affidavits and certifications filed in support of Stearns & Foster's motion for summary judgment is DENIED.